PEOPLE *v.* LIPSCZINSKA.

**1.** CRIMINAL LAW—HOMICIDE—EVIDENCE—ADMISSIBILITY.

In a prosecution for homicide, where it was charged that defendant had killed a nun and buried her body under a pile of lumber in the basement of the church where it had remained for a number of years, and where the priest of said church had testified that he had secretly exhumed a human skeleton from the basement of the church and buried the same in the cemetery, it was proper to permit him to explain his reasons for so doing.

**2.** SAME—EVIDENCE—WAIVER.

Where defendant offered proof by way of an affidavit of said priest that the original source of the information as to the presence of the skeleton was the bishop of the diocese, and that the skeleton was that of the nun whose murder was charged, defendant could not complain because the prosecution was permitted to confirm these facts, since she first introduced them.

**3.** SAME—PRIVILEGED COMMUNICATIONS—CONFESSIONAL—WAIVER.

If said testimony was privileged because obtained through the confessional, said privilege was waived by defendant, and she could not complain of the admission of testimony which went no further than to confirm the facts already proven by her.

**4.** SAME—CONFESSIONS—ADMISSIBILITY.

If a confession testified to, claimed to have been made by defendant, was made as the result of inhuman treatment accorded to her by witness and the sheriff, which affected her mind, as claimed by her, it should not have been received in evidence.

**5.** SAME—CHARGE OF INHUMAN TREATMENT—DENIAL—WEIGHT OF TESTIMONY FOR JURY.

Where defendant's testimony as to said inhuman treatment was denied by the witness and the sheriff, although the latter did not specifically deny *seriatim* each and all of the many indignities defendant claimed was heaped upon her,

applying the maxim *falsus in uno, falsus in omnibus,* it
was for the jury to say whether any of her testimony upon
material matters was to be believed, and what weight
should be given to said confession.

6. SAME—CONFESSIONS—VOLUNTARY—INDUCEMENTS.
    Testimony by said witness, who was not one in authority,
    that said confession was made to her following a request
    by defendant that witness do something for her, when
    witness answered "If you want me to do anything, tell
    me what and tell me all," *held,* not to be such an induce-
    ment as rendered the confession inadmissible.

7. SAME—ADMISSIBILITY OF CONFESSION OBTAINED BY DECEIT.
    Nor was said confession inadmissible because obtained by
    the deceitful method of placing said witness in the cell
    with defendant ostensibly as a prisoner, but for the real
    purpose of obtaining information.

8. SAME—WITNESSES—ADVERSE WITNESS.
    Where defendant's daughter was an inmate of the priest's
    home with defendant and the nun whose murder is
    charged, and was in the house the afternoon the crime
    is alleged to have been committed, she was a proper if
    not a necessary witness for the prosecution to produce,
    and where her testimony did not accord with an affidavit
    signed by her, the court properly allowed the prosecution
    to conduct her examination along the lines of cross-exami-
    nation, and treat her as an adverse witness.

9. SAME — CROSS-EXAMINATION — COLLATERAL    MATTER — ANSWER
    BINDING.
    Testimony offered by defendant to contradict some of the
    sheriff's statements on cross-examination in reference to
    having defendant sign her name on a blank piece of paper,
    was properly excluded, since it was a collateral matter,
    and defendant was bound by witness' answer.

10. SAME—EXHIBITION OF SKELETON NOT OBJECTIONABLE.
    Exhibition of the skeleton found under the church, and used
    by the physicians in giving their testimony, *held,* not open
    to the objection that such gruesome exhibit was made to
    prejudice the jury.

11. SAME—TRIAL—INSTRUCTIONS—REQUESTS.
    *Held,* that the charge of the court fully protected the de-

fendant's rights, and that defendant's requests were given either in the language of the requests or in substance.

12. SAME—TRIAL.

Defendant's request for reversal on the broad ground that she has not had a fair trial, and that she should have been acquitted, must be denied, where it appears that she had able counsel to defend her, that her rights were fully protected by the trial judge, and that the evidence of her guilt is strong and convincing.

Error to Leelanau; Mayne (Frederick W.), J. Submitted October 15, 1920. (Docket No. 116.) Decided December 21, 1920.

Stanislawa Lipsczinska was convicted of murder in the first degree and sentenced to imprisonment for life in the house of correction at Detroit. Affirmed.

*P. T. Glassmire* and *Charles A. Withey*, for appellant.

*Alex. J. Groesbeck*, Attorney General, *C. L. Dayton*, Prosecuting Attorney, and *P. C. Gilbert*, Assistant Prosecuting Attorney, for the people.

FELLOWS, J. At the hamlet of Isadore in Leelanau county in a Polish settlement there was in 1907 a Catholic church presided over by Father Bieniawski. In his household were his sister, then a young girl, his housekeeper, the defendant, her daughter, 16 or 17 years old, and a chore boy named Gruba. There was, near the church, a convent and school where three nuns of the Felician order lived and taught the children of the parish. They were Sister Mary Janina, or Mary John, as she was sometimes called, Sister Angelina and Sister Josephine. Sister Janina was the superioress. These sisters were of somewhat delicate health and all of them remained at the convent during the summer vacation. It was expected that the

bishop of the diocese would come to Isadore to bless the school on Sunday, August 25th. Upon such events the school was usually decorated. Among the decorations used on such occasions were some artificial flowers which were stored when not in use under the church. The mother superioress usually saw to getting and putting up these decorations. The church faced on a north and south street and the ground sloped towards the back of the church. The basement under the church followed the slope of the land, no excavating having been done, and was of uneven height. There was wainscoting around it, and there was a pile of pieces of lumber and boards stored there.

On the Friday preceding the expected visit of the bishop, Father Bieniawski, his sister and the lad, Gruba, went on a fishing trip for the afternoon to a lake not far from Isadore. They left shortly before one o'clock. The Father had been about home during the forenoon and saw Sister Janina several times. She was preparing for the decoration of the school. When they left for the fishing trip the three sisters, the housekeeper, and her daughter waved them goodbye. These five persons were the only ones left about the premises. The sisters were in the habit of taking an afternoon nap. They had separate rooms and defendant says she saw them draw the shades in their respective rooms preparatory to taking their usual siesta.

Later in the afternoon and near four o'clock Sisters Angelina and Josephine discovered that Sister Janina was missing and communicated this fact to the housekeeper and her daughter. Search was made about the premises and in the neighborhood, but she could not be found. The fishing party returned about half-past seven or eight o'clock and the Father was informed of the disappearance of the Sister. The search continued until late in the night and was resumed the fol-

lowing day. The officers were notified and joined in the search. On Sunday the Father reported to his congregation the disappearance of Sister Janina and requested the men to organize and conduct a systematic search. Some 350 or 400 responded, but of no avail. Detectives were brought in from outside and a large reward offered. These efforts were likewise fruitless. Some two weeks after the disappearance a bloodhound was brought to Isadore and being given the scent led the searching party through the cornfield into the woods. No thorough search of the basement was made, although some of the searching party went into it. It does not appear that the pile of boards or lumber was disturbed. All efforts to discover the whereabouts of Sister Janina, if living, or the location of her body, if dead, came to naught, and for years her disappearance was among the unsolved mysteries.

In February, 1919, the officials of Leelanau county received information which caused them to make an investigation. They sought out the sexton of the church and from him learned that in the autumn before he had, by direction of, and assisted by, Father Podlaszewski, then priest of the parish of Isadore, dug up a human skeleton in the basement of the church where the boards and lumber had been, and that he had interred the bones in the cemetery. He showed the officials where they could be found. The officials dug at the place indicated and found the bones. The officials summoned the coroners of the county who assembled the bones and determined that the skeleton was that of a female from 62 to 65 inches in height. They also discovered a fracture in the skull. The officials then went to the basement of the church and screened the dirt where the grave had been. They recovered, among other things, pieces of cloth, a cross with an image on it, a piece of cord, a spool, a little metal cross, a part of a scapular, a thimble and a ring.

It should be stated at this point that upon the trial it appeared that the cloth found in the grave was of similar texture to that worn by the Felician Sisters; that the cord was likewise similar to the cord worn by the members of this order; that the piece of scapular and the cross were like those worn by this Sisterhood. But the most convincing proof of identification was the ring. It was of special design. The inside was of silver, the outside of steel. Sister Janina had graduated in a class of 22, each of whom had been given a ring of this design in which the date and certain characters were engraved. They were always worn by the Sisters after they took their perpetual vows and were left on their fingers at death and buried with them. There were but 22 of these rings made, one for each member of the class. Twenty-one of these rings were accounted for. The missing one—the one worn by Sister Janina—was found in this grave underneath the church. The identification of the skeleton as that of Sister Janina was as near perfect as circumstantial evidence could make it.

Shortly after the finding of the skeleton the defendant was arrested, charged with the murder of Sister Janina. At the October term, after a trial lasting something over three weeks, she was found guilty of murder in the first degree and sentence was imposed. It is the theory of the prosecution, and the case was tried upon this theory, that after the fishing party left Isadore that August afternoon there were left but four persons beside Sister Janina: the defendant and her daughter and the two Sisters, Angelina and Josephine. That of these four persons the defendant only was shown to have borne ill-will towards this nun; that she had on many occasions deprecated her character, and had intimated that she would or should soon leave. It is the theory of the prosecution that Sister Janina, in preparing the school for the visit of

the bishop, went to the basement for the artificial flowers which were there stored, was then struck down by the defendant not far from the door—glasses similar to those worn by Sister Janina being there found—that defendant, a Polish woman accustomed to outdoor work, moved the pile of lumber or boards away, dug a grave in the sandy soil, buried her victim and replaced the lumber. The proof of the prosecution was directed to the sustaining of this theory.

In the early stages of the trial the prosecution called Father Podlaszewski as a witness. Over the objection of defendant he was permitted to explain his unusual conduct in secretly digging up the bones and having them buried in the cemetery at night. His explanation was this: The parish had planned to erect a new church at Isadore on the site of the old one. Father Lempke, a priest located at Detroit, where he was chaplain of the Felician Sisters, had informed him that there was a skeleton under the church at Isadore and had suggested to him that in order to save a scandal to the church he should secretly exhume the bones and bury them in the cemetery. When the direct-examination of this witness was concluded the testimony in the case had gone no further than to show the reasons for the unusual conduct of the witness in secretly taking up the bones and secretly burying them. This witness was subjected to a most vigorous cross-examination, in the main revolving around an affidavit he had made with reference to the case, and copious excerpts were read to him and he was interrogated about them at length and finally the affidavit in its entirety was offered in evidence by defendant's counsel. In some particulars it tended to contradict some of the testimony of this witness. It is quite voluminous and covers eight pages of the record. We cannot within the compass of this opinion state its entire contents nor quote it in full. We, however,

quote from it an excerpt which is pertinent to the question we are about to consider. It is as follows:

"The next thing I heard concerning this matter was from Rev. Father Lempke of Detroit, Michigan. I met him at Father Skory's house at Grand Rapids, on the occasion of a 40 hours' devotion held at that priest's church during the latter part of May or fore part of June, 1918. I had a conversation with Father Lempke there, and I told him I intended to build a new church at Isadore, Michigan. Then Father Lempke said to me, 'I heard from Bishop Koslowski that Sister Mary John, who disappeared at Isadore some years ago, was buried under the church.' And he said he thought it would be advisable to remove those remains secretly. He said, 'I am not positive of this, but the information I received stated that she was buried there by Mrs. Lipsczinska.'

"I questioned him more about this and he said that he did not know any more about this, but that the rumor that Father Bieniawski was implicated in this was untrue. Then, of course, we spoke about the method of removing those bones. He advised me to do it personally so that nobody would see them, to do it at night and remove those bones to the cemetery. I did not have any further conversation with him about this subject-matter.

"Father Lempke at this time did not state to me the manner or mode by which Bishop Koslowski had communicated this information; he did not state whether he received this information from Bishop Koslowski through letter, by word of mouth, or through the interposition of a third person. I now further recollect that he, Father Lempke, also stated at that time that the body was buried under the church under a pile of boards."

After the introduction of this affidavit in evidence by defendant's counsel, the people were permitted, over objection of defendant's counsel, to introduce testimony confirmatory of that portion of the affidavit above quoted. Different witnesses through whom the information was traced back to the bishop testified to the fact that such information was given; but no

witness was permitted to testify to the conversation
had, and only to the simple fact that the information
was given.   One witness did state part of a conversa-
tion, but without objection being made by the defend-
ant's counsel the court struck out the testimony relat-
ing to the conversation, and directed the jury not to
consider it.   None of this testimony went further
than the statement in the affidavit introduced in evi-
dence by the defendant.   Indeed it did not go as far.
None of it connected defendant with the transaction.
It should be noted that by the affidavit introduced in
evidence defendant and not the people first traced back
to Bishop Koslowski the information that the body of
Sister Janina was buried under the church at Isadore.
It might be inferred from the fact that Bishop Kos-
lowski filled a high office in the Catholic church, that
the information came to him through the confessional,
but there was no direct testimony to this effect until
later in the case.   Counsel for defendant most strenu-
ously insist that the admission of this testimony vio-
lated the law of the confessional; that it was incom-
petent, hearsay, and if by any possibility it may be
said that any part of it was admissible that portion
of it tending to show that the information conveyed
included information that the body was that of Sister
Janina was absolutely incompetent and should not
have been received.

Let us re-state the situation.   Father Podlaszewski
had secretly exhumed a human skeleton from the base-
ment of the church and as secretly buried the bones in
the cemetery.   We think it was proper to permit him
to explain his reason for so doing.   His reasons for
this secret conduct were as stated by him in his exami-
nation in chief.   Defendant's counsel then introduced
proof by way of his affidavit that the original source
of the information as to the presence of the skeleton
was Bishop Koslowski; that the information conveyed

included the further fact that these bones were the
bones of Sister Janina.    These facts were put into the
case for the first time by the defendant.    The people
were then permitted to confirm these facts so put into
the case by the defendant herself.    It is the uniform
holding of this court that one may not complain of the
admission of testimony by the other side of facts which
he himself has already established by testimony
offered by himself and already in the case.    *Weather-
bee* v. *Byam*, 160 Mich. 600; *Obenauer* v. *Solomon*, 151
Mich. 570; *Buxton* v. *Ainsworth*, 153 Mich. 315;
*Weaver* v. *Richards*, 156 Mich. 320; *Reese* v. *Railway*,
159 Mich. 600.

But it is urged that the secrets of the confessional
were invaded and its privileges disregarded.    If we
should take into consideration the testimony later put
into the case, or we should accept the inference that
Bishop Koslowski received his information through
the confessional and assume that to be a fact, it does
not aid the defendant.    We have not before us and
do not decide whether this testimony would be admis-
sible if defendant had not first introduced testimony on
the subject.    The privilege of the confessional is the
privilege of the penitent, and if the penitent waives
such privilege to the extent of giving evidence of what
took place at the confessional, he or she cannot com-
plain of evidence which goes no further than to estab-
lish the facts proven by him or her.    What we have
here stated is upon the assumption which defendant's
counsel seem to contend we should indulge in, that
Bishop Koslowski received his information through
the confessional.    As already stated when the testi-
mony under consideration was offered, there was no
proof of that fact beyond what might be inferred
from his position in the church.

Not long after defendant's arrest the authorities
employed a female detective, Mrs. Tylicki, a Polish

woman from Milwaukee. She understood and spoke the Polish language, which defendant used better than she did the English. She was put in the jail with defendant supposedly as a prisoner. Mrs. Tylicki was called as a witness upon the trial. She gave testimony of a confession by the defendant. Before giving this testimony she was subjected to a vigorous cross-examination by defendant's counsel and adhered to her contention that she had held out no inducements to procure the confession, and that it was a voluntary one; she denied many things which defendant's counsel inferentially by his questions accused her of. It is well that we here give the substance of her testimony relating to the confession. Briefly stated, Mrs. Tylicki's testimony was that after she had been in jail with defendant a few days, defendant asked her if she would do something for her. Mrs. Tylicki testifies that she said, "If you want me to do anything, tell me what and tell me all." Defendant then requested her to go to Father Bieniawski and tell him to have Father Podlaszewski put out of the States and that he would pay her well for going there; that defendant said she went to Father Nowack, a priest in Milwaukee, and confessed her sins; that she had killed Sister Janina; that she dug the hole under the church and dragged the body to it and put the Sister in the hole she had dug, and covered the body partly with earth, and that while doing so the head rose three or four times and that she struck the Sister on the head three or four times with all her might; that she had in her confession to Father Nowack told him all, just as she related it to the witness, and that the Father had told her he could not grant her absolution without seeing Bishop Koslowski; that the priest went away for a short time and returned and granted her absolution and that then she left the church. She claimed that the murder had come out through Bishop Koslowski. This conversation witness

says occurred on April 28th.   On the following day defendant repeated the confession.   The witness also testified that soon after she went into the jail defendant told her she was going to pretend that she was crazy and that they would believe she was.   It should be stated in this connection that defendant's conduct became unnatural about the first of May, and on May 17th, upon proper commitment, she entered the Psychopathic hospital at Ann Arbor where she remained under observation until July 28th when she was returned to the jail.   The doctor having her in charge was called as a witness and gave the opinion that she was not insane but was simulating.

Defendant took the stand as a witness in her own behalf.   She denied all connection with the death of Sister Janina, gave an account of her doings on the August afternoon in question which accounted for the time from the leaving of the fishing party until the absence of the Sister was discovered.   She denied having expressed any ill-will towards Sister Janina.   She denied the confession and testified to a brutal and fiendish course of treatment, including personal violence, practiced upon her by the sheriff and Mrs. Tylicki, resulting, as she claimed, in her mental breakdown and absolute irresponsibility for her conduct or language.   It is her testimony that she was struck over the head by Mrs. Tylicki with a dipper on one occasion and that she plied her with liquor; that she was taken into another cell where the bones of Sister Janina had been arranged, that the skull had been strung on strings so that it could be manipulated, that there were two candles by the skeleton, and that she was thrown into a box or bunk in the room where the skeleton was and kept there for a couple of hours; that on one occasion the sheriff came to her alone with the skull, and worked it with his hands and crowded it into her face, and it seems to be her claim and that

of her counsel that such conduct made her mentally unbalanced, that she was not responsible for what she said, and that this treatment was what produced the confession if one in fact was made, which fact she denies.

If defendant was accorded the inhuman treatment she claims she was, and as a result she made a confession, such confession should not have been received. But her testimony is not unchallenged; in fact it was denied *in toto*. Mrs. Tylicki denies all charges made against her. As to the exhibition of the bones, it is the testimony of the people's witnesses that defendant was asked if she wanted to see the remains of Sister Janina and expressed a desire to see them. That she was taken into the room where they were and shown them; that there was an electric light burning in the room, but that there were no candles burning or arrangement of the bones or skull as claimed by her, that she was not put in a box or bunk, but returned to her own room as soon as she desired. But counsel arguing the case says the sheriff did not specifically deny her testimony as to crowding the skull in her face on one occasion when she says he was alone with her. He insists, therefore, that her testimony is uncontradicted and the court should have eliminated the confession, as matter of law. It is true that the sheriff was not called upon by the prosecutor to deny *seriatim* each and all of the many indignities defendant claims he heaped upon her. He was, however, asked a general question covering the treatment accorded defendant. We quote from his testimony:

"*Q.* Whenever you did see her, and particularly when you were in or around the jail, state whether you ever observed anything in the way of ill-treatment or neglect of her?

"*A.* No sir; she never entered any complaint to me or to Mrs. Anderson or to anyone else in charge about being mistreated. Some of the time between the 10th

of April and the middle of May, in going to and from her meals she was attended by Mrs. Anderson and sometimes she went alone. During all the time she was in jail she had a woman attendant."

It should be further stated that the sheriff testified to making a trip to North Manitou Island, Milwaukee, Chicago and Detroit, starting on the 25th of April. If he is correct about the date he left Leland it would be practically impossible that he was back there at the time defendant claimed he manipulated the skull in her face. Upon the argument it was stated that undoubtedly the sheriff was mistaken as to the date he left Leland. But the record does not show conclusively that he was mistaken. Whether he was or was not cannot be determined, as matter of law. We do not think it can be said that defendant's testimony upon the question of the treatment she received at the jail was uncontradicted. Her testimony upon every material point was in direct conflict with that given by the people's witnesses. Applying the maxim *falsus in uno, falsus in omnibus,* it was for the jury to say whether any of her testimony upon material matters was to be believed.

While defendant by her testimony challenges the material evidence given by the people, we do not understand her to contradict the testimony showing that she and her room were well cared for during her stay at the jail; she was provided during all the time with a woman attendant, was not required to live on the jail fare but was permitted to take her meals at the residence of Judge Brown, the judge of probate of the county, sometimes going alone and sometimes going with an attendant.

Upon the argument much was made of the fact that Mrs. Tylicki testified that when defendant asked her to do something for her, she, Mrs. Tylicki, said: "If you want me to do anything, tell me what and tell me

212—Mich.—32.

all." It must be remembered that Mrs. Tylicki was not one in authority. But this language was not such an inducement as rendered the confession inadmissible. This is ruled by the recent case of *People* v. *Foster,* 211 Mich. 486.

This court has recognized the universal rule that where the facts are not disputed the question becomes one of law to be decided by the court. Where the facts are disputed the question is one for the jury. In *People* v. *Prestidge,* 182 Mich. 80, Mr. Justice BIRD, speaking for the court, thus announced the rule:

"If the preliminary testimony made it clear either that the statement claimed to have been made was voluntary or involuntary, it was the duty of the trial court to admit or reject it. If the testimony left the question in doubt, it was the duty of the court to admit it, and leave the question to the jury under proper instructions to determine whether it was voluntarily made."

In the instant case the testimony was in direct conflict. If the testimony of the people's witness was to be believed, defendant's confession was a voluntary one. If her testimony was believed, most fiendish atrocities had been practiced upon her to procure it, and it should be entirely disregarded. It was for the jury to decide which line of testimony bore the earmarks of truth.

Nor was the confession inadmissible because deceit was used in procuring it. *People* v. *Dunnigan,* 163 Mich. 349 (31 L. R. A. [N. S.] 940). In that case the officers had arranged with one Wilcox to obtain from defendant such information favorable to the people's case as he could, Wilcox to be paid by the officers. Wilcox was admitted to the jail to cut defendant's hair, and procured from him a letter to his wife which Wilcox turned over to the officers. It was in the nature of a confession. While this court condemned the method used to obtain the confession, it held that it

was admissible in evidence. This is in accordance with the holding of other courts. *Burton* v. *State,* 107 Ala. 108 (18 South. 284) ; *State* v. *Brooks,* 92 Mo. 542 (5 S. W. 257, 330) ; *Heldt* v. *State,* 20 Neb. 492 (30 N. W. 626) ; *Commonwealth* v. *Flood,* 152 Mass. 529 (25 N. E. 971) ; *People* v. *Scott,* 195 N. Y. 224 (88 N. E. 35).

In *Burton* v. *State, supra,* defendant was less than 15 years old. A detective had been placed in jail with him, had obtained his confidence and secured a confession. The court, considering its admissibility, said:

"He seems to have acquired the entire confidence of defendant. This may have been the more easily accomplished, because of the youth and unsuspecting character of the defendant, but the question for consideration is whether the confessions were voluntary. The fact that the defendant was deceived, does not in the least tend to show that his statements in regard to the killing of Evans were induced by hope or fear, or calculated to elicit an untrue statement. What weight, if any, a jury would give to the testimony of the detective, or confessions elicited under such circumstances, rests wholly with them. We do not think the court erred, in holding that they were competent for the consideration of the jury."

In *State* v. *Brooks, supra,* the same course had been pursued. Holding that the confession was admissible, it was said:

"It is further insisted that, owing to the methods resorted to to obtain the confession, it was error to receive it in evidence. While the officers whose duty it was to prosecute criminal offenses, may, in their anxiety to ferret out the circumstances concerning the death of Preller, have overstepped the bounds of propriety in the course pursued by them, which is not to be commended, but condemned, it affords no legal reason for rejecting the evidence and not letting it go to the jury whose peculiar province it was to pass upon the credibility of the witness who detailed the confession and give to it such weight as, under the circumstances, they believed it entitled to. It was

for the court to say what evidence should be received and for the jury to say what weight it should have when received."

We have thus far confined our discussion to those questions which were discussed in the oral argument. Other questions are fully discussed in the brief of defendant, and to them we shall now direct our attention. The prosecution called defendant's daughter as a witness. It will be remembered that she was at the priest's home the afternoon of the disappearance of Sister Janina. She was a proper if not a necessary witness for the prosecution to produce and her name was on the information. She had been sworn as a witness at the preliminary examination and had also signed an affidavit. Her testimony upon the trial did not accord with the affidavit. The prosecution was permitted by the court to treat her as an adverse witness, and to conduct her examination along the lines of cross-examination. We perceive no error in this. It may not be unnatural to expect that a daughter would attempt to screen her mother on trial for crime. The witness had by her attitude, relationship and testimony shown herself to be an unwilling and adverse witness. The court properly allowed the prosecution to treat her as such and to cross-examine her.

Defendant was arrested by the sheriff of Leelanau county at Manistee where she was still the housekeeper of Father Bieniawski, who had moved to that city. Upon cross-examination of the sheriff this appeared and it developed that defendant was taken to the sheriff's office in Manistee after her arrest. The witness was asked if he had not requested defendant to write her name. He admitted that he had, but denied expressing or having any ulterior purpose, or any purpose, other than to obtain her correct name. The defendant signed her name on a blank piece of paper, but no use appears to have been made of it un-

less we may infer that it correctly spelled this Polish name.   Defendant offered by a witness to contradict some of the sheriff's testimony brought out on cross-examination with reference to this paper.   It was a collateral matter, defendant was bound by the witness' answer.   *People* v. *Williams,* 159 Mich. 518, and authorities there cited.   The court did not err in excluding this testimony.

The bones found under the church were brought into court and were received in evidence without objection. After they were received in evidence the physicians, over objection of defendant's counsel, assembled the bones.   We do not think defendant's objection tenable. One of the purposes of assembling the bones was to show the height of the skeleton, to demonstrate that it was that of a female, and one of the doctors made use of the bones in explaining the difference in the bones of the male and the female.   The condition of the skull and whether the fracture found in it was made before or after death was a matter of direct conflict between the experts of the State and the one called by defendant.   The bones were in the same condition as when found, they were used, and legitimately so, by the physicians in giving their testimony, and we perceive no basis for the claim that such gruesome exhibit was made to prejudice the jury.

There is a general complaint that the charge was unfair to the defendant and that certain requests should have been given.   We have examined the charge with care.   The defendant's rights were fully protected by it.   Such requests as defendant was entitled to have given were given either in the language of the requests or in substance.

Finally we are asked to reverse the case upon the broad grounds that defendant has not had a fair trial and that she should have been acquitted, and *People* v. *Murray,* 72 Mich. 10, is cited as authority for such

contention. There will be found in the opinion in that case some language not necessary to the decision which we do not at this time indorse. But that case radically differs from this one. In that case (1) the defendant was poorly defended, (2) the trial judge did not protect him in his rights, and (3) the evidence of his guilt was weak. In the instant case (1) the defendant had the assistance of three of the ablest counsel in that part of the State, (2) her rights were fully protected by the trial judge, and (3) the evidence of her guilt is strong and convincing.

The defendant has had a fair trial; she has been convicted by an impartial jury. We find no occasion to disturb the verdict. Her conviction is affirmed.

MOORE, C. J., and STEERE, BROOKE, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.