## WIRTANEN *v.* THE PRUDENTIAL INSURANCE COMPANY OF AMERICA

1. EVIDENCE—PRESUMPTIONS—SUICIDE—PROOFS PRESENT.

   The presumption against suicide arises when death and the violent nature of the death have been proved or evidence from which the jury could infer these facts has been presented.

2. EVIDENCE—PRESUMPTIONS—SUBSTANTIVE EVIDENCE.

   A presumption is substantive evidence.

3. EVIDENCE — PRESUMPTIONS — PRIMA FACIE CASE — DIRECTED VERDICT — PLAINTIFF.

   A presumption alone is sufficient to establish a *prima facie* case on plaintiff's behalf; if the defendant introduced no proofs to the contrary, the plaintiff could properly seek a directed verdict.

4. EVIDENCE — PRESUMPTIONS — PRIMA FACIE CASE — DIRECTED VERDICT — DEFENDANT.

   A presumption alone is sufficient to establish the plaintiff's *prima facie* case; however, if the defendant does introduce evidence, the plaintiff is not entitled to a directed verdict unless the evidence and permissible inferences from it, viewed most favorably to the defendant, leave no room for disagreement among reasonable men.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 29 Am Jur 2d, Evidence § 217.
[2] 29 Am Jur 2d, Evidence §§ 11, 164, 165.
[3] 30 Am Jur 2d, Evidence § 1165.
[4] 53 Am Jur, Trial § 355.
[5] 53 Am Jur, Trial § 353 *et seq.*
[6] 29 Am Jur 2d, Evidence § 123 *et seq.*
[7] 53 Am Jur, Trial § 681.
[8] 29 Am Jur 2d, Evidence §§ 253, 255.
[9] 53 Am Jur Trial § 480.

5. MOTIONS—DIRECTED VERDICT—STANDARD—PRESUMPTION.

A directed verdict against a litigant is proper only if the evidence and permissible inferences from it, viewed most favorably to that litigant, leave no room for disagreement among reasonable men; in cases in which there is a presumption, this standard to determine the propriety of granting a motion for a directed verdict is the same as if the presumption, as a rule of law, were never involved.

6. EVIDENCE—PRESUMPTIONS—LIMITATION OF USE.

A presumption cannot be used evidentiarily twice; if after actual evidence had been introduced to support the plaintiff's theory and the applicable presumption considered, the evidentiary scales were equipoised, the plaintiff's case would, of necessity, fall for want of sustaining the burden of proof.

7. TRIAL — PRESUMPTIONS — EVIDENTIARY FACTS — JURY INSTRUCTIONS — APPEAL AND ERROR.

The trial judge had a duty to instruct the jury as to the evidentiary value of the presumption against suicide and his failure to do so was reversible error where the composite of plaintiffs' proofs was clearly sufficient to warrant the jury in finding that a weapon discharged or was discharged accidentally, and that thus the death of an insured was not suicide, and the defendant had produced sufficient evidentiary facts so that the jury could have reasonably and permissibly inferred that the wound was intentionally self-inflicted, and that thus the death was suicide.

8. EVIDENCE—RELEVANCY.

Allowing a minister, who had visited the deceased in the hospital, to state that the deceased had told him what happened the day deceased was shot was reversible error where the minister was not allowed to repeat what the deceased had said and where the central issue at trial was whether the deceased had shot himself intentionally or accidentally, because the minister's testimony allowed the jury to speculate on what the deceased had said and might have made all of the other circumstantial proofs subordinate to this speculative inquiry.

9. TRIAL—ARGUMENT—IMPROPER ARGUMENT.

Insurance company's counsel's asking the jury, on closing argument, "What would your policy be worth upon your death" if the insurance company paid all claims made was impermissible argument.

Appeal from Houghton, Stephen D. Condon, J. Submitted Division 3 April 3, 1970, at Marquette. (Docket No. 7,134.)   Decided October 8, 1970.

Complaint by Edward A. Wirtanen and Lydia Wirtanen against The Prudential Insurance Company of America to recover on a policy of life insurance.   Verdict and judgment of no cause for action. Plaintiffs appeal.   Reversed and remanded.

*Wisti, Jaaskelainen & Bourland,* for plaintiffs.

*Messner, LaBine & Vairo,* for defendant.

Before:  FITZGERALD, P. J., and J. H. GILLIS and O'HARA,* JJ.

O'HARA, J.   This is an appeal of right from a jury verdict of no cause of action.   The jury by its verdict rejected plaintiffs' claim for $5,000, alleged by them to be owing under a double indemnity clause in a policy of life insurance.   The clause provided for payment of an amount equal to the face value of the policy in case of accidental death of the named insured.   It specifically excluded such benefit in case of suicide.

The insured was Bruce Wirtanen; the beneficiaries were his mother and father, the plaintiffs herein.   The defendant was the policy-issuing insurer.

According to the record the deceased was 21 years of age at the time of his death.   He had been graduated from high school three years previously.   He was unmarried and living during that period at home with his parents.   On the morning of June 20, 1963, while alone in his upstairs bedroom he sus-

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

tained a gunshot wound which ultimately caused his death on July 1.

In support of their theory of accidental death, plaintiffs introduced testimony to the effect that the deceased was an avid outdoorsman kept his shotgun with him a great deal of the time, whether there was an open season upon game or not, and that in the off-season shot rodents and pests. The weapon was testimonially described as secondhand with an imperfectly fitting and replaced stock; as having a hair trigger; and, as being capable of and as having on past occasions, discharging accidentally from a jolt or jar. The weapon was described by deceased's father as hammerless, with the firing pin imbedded in the metal forepart of the stock. When loaded and with the breech closed the weapon was cocked and ready to fire. It had a sliding safety located just back of the breech that moved forward and backward along the stock to two positions, "safe" and "fire."

Part of plaintiffs' case in chief was in a sense anticipatory. Bruce was described as an "ordinary sort of guy," a so-so student, perhaps not even overly bright. The testimony is a little fuzzy on the point, but at least it was sufficient for a fair inference that he flunked the "written part" of the Armed Forces General Intelligence test and was distressed or disappointed at this failure. In the three-year period above mentioned, he did not seem able to get or hold a steady full-time job. For this he was criticized by his father. There was some testimony that there were instances of quarrels with his parents and that they "hollered" at him. A fair summation of the relationship was that it was not aggressively antagonistic. There is no suggestion in the testimony of that degree of deep depression amounting to a pre-suicide despondency. On the

day of the fatal wounding he had breakfast downstairs and had received word that two temporary part-time jobs were available to him. He is quoted in the record as having said, "Yesterday I had no job, today I have a chance for two," or words to that effect. It was contended that he had some long-range plan to go to the Lower Peninsula, specifically Battle Creek, in the fall where he thought employment opportunities were better. After finishing his breakfast, he went upstairs ostensibly to get his shoes. He was alone in the room when the fatal abdominal wound was sustained.

*Per contra,* the defense introduced testimony of which the thrust was that Bruce was deeply depressed, picked on by his parents, the subject of constant criticism, and despondent over his failure to pass the induction test. There was conflicting testimony that the weapon did not have a "hair trigger"; that the place of the wound pointed to the fact that it was intentionally self-inflicted; and, in finality, that on the way to the hospital in the ambulance Bruce was heard to say, "Nothing seems to go right—I just don't care any more." Additionally, the defense called as its witness the family spiritual advisor, a Lutheran minister, who visited Bruce several times in the hospital. He was allowed by the trial court to be asked and to answer the following question:

"*Q* Now on these occasions did you ask Bruce what happened at his residence on June 20, 1963.

"*The Court:* Just answer that question, Reverend, yes or no.

"*A* Yes.

"*(Defense counsel):* That's all, Reverend, thank you.

"*(Plaintiffs' counsel):* No questions".

The court would permit no questions or answers concerning *what* the deceased said on the subject.

The first issue on review concerns the charge of the court. Plaintiffs requested an instruction that under the record as made there was a presumption against suicide. The trial court refused to give it. Plaintiffs properly saved the question for review. We address ourselves to it.

Decision herein calls for an analytical examination of a Michigan Supreme Court decision which explicitly overruled the holding in two cases[1] which had long been the settled law of this state. In the Supreme Court's words, it also overruled all cases "like them." The overruling case is *In re Wood Estate* (1965), 374 Mich 278. Its impact upon the jurisprudence of the state is of the first magnitude. We are cited no Michigan case, nor did our extensive independent research unearth one, which applied the decision in *Wood* to the question presented by the case at bar. We treat it as a case of first impression.

*In re Wood Estate* has been the subject of a scholarly treatise by Professor Charles Quick of the Wayne State Law Faculty[2] and has been given special attention at 5 ALR3d 1.

The case deals with the evidentiary aspects of the law of presumptions. Although *Wood* was concerned with the presumption of undue influence, where one in a confidential and fiduciary relationship to a testator became his beneficiary, we read the case to deal with the whole field of legal presumptions in our state and we so hold decisionally. Thus, the principles of *Wood* are applicable to the case at bar even though the instant case concerns the presumption against suicide.

---

[1] *In re Haskell's Estate* (1938), 283 Mich 513; *In re Teller's Estate* (1939), 288 Mich 193.
[2] Civil Evidence, 12 Wayne L Rev 140 (1965).

Prior to *Wood,* Michigan adhered to the so-called "Thayer" view of presumptions. This view has sometimes been called the "bursting bubble" theory. In substance, it holds that a presumption regulates only the burden of going forward with proof and is dissipated whenever substantial evidence to the contrary is adduced by the opponents of the presumption (Civil Evidence, 12 Wayne L Rev 140 [1965]).

The issue in *Wood* was clearly stated. For the minority Mr. Justice DETHMERS wrote:

"I do not agree   *   *   *   that the presumption   *   *   *   may be permitted to stand as evidence in the face of rebuttal evidence. Such presumption may be introduced to supply the want of real facts but does not obtain against substantive proofs. When positive proof enters the door, contrary presumptions of this character fly out of the window". *Wood, supra,* (dissent) pp 297, 298.

For the majority Mr. Justice SOURIS wrote in a somewhat syllogistic manner:

"Presumptions in the law are almost invariably crystallized inferences of fact. Experience has taught that if certain evidentiary facts be established, there is such a strong practical likelihood that another stated fact will be true that that fact may be presumed. The law's special recognition of this lesson of experience is expressed by its rulings that if a litigant proves evidentiary facts A and B, then fact C's existence will be presumed". *Wood, supra,* pp 288, 289.

In *Wood* the "A" factor was evidence tending to establish that a confidential and fiduciary relationship existed between the testator and his private secretary. The "B" factor was proof that the fiduciary was the recipient of a substantial testamentary bequest. The proof of these two factors,

or evidence from which the jury could permissibly infer the existence of these two factors, gave rise to the "C" factor, a legal presumption, namely the exercise of undue influence by the fiduciary. The trial judge directed a verdict for the proponents of the will. The Supreme Court reversed and held the question was for the jury. This holding implicitly required an instruction concerning the evidentiary effect of the presumption, if the jury found as facts the existence of the "A" and "B" factors.

By analogy in the case at bar, the "A" factor is the fact of death. The "B" factor is the fact that the death was violent. Proofs establishing these two factors result in the "C" factor, the presumption against suicide.

The question then arises what weight is to be given to "C". According to *Wood,* the "C" factor has been raised to the level of substantive evidence. Thus, it alone is sufficient to establish a *prima facie* case on plaintiffs' behalf. If the defendant introduced no proofs to the contrary, plaintiffs could properly seek a directed verdict in their favor. If, however, defendant does introduce evidence to the contrary, plaintiffs are not entitled to a directed verdict unless the directed verdict requirement of *Wood* is met. We set forth the controlling language.

"This does not mean, of course, that in no case when evidence is introduced controverting a presumption or the facts upon which a presumption is based may a verdict be directed. The standard used to determine the propriety of a directed verdict is the same as if the presumption, as a rule of law, were never involved—namely, a directed verdict against a litigant is proper only if the evidence *and permissible inferences therefrom,* viewed most favorably to that litigant, leave no room for disagreement thereon among reasonable men." *Wood, supra* p 291. (Emphasis the Supreme Court's.)

We think that the composite of plaintiffs' proofs here was clearly sufficient to warrant the jury in finding that the weapon discharged, or was discharged accidentally, and thus, by definition the death was not suicide. We read the record also to have had sufficient evidentiary facts adduced by defendant so that the jury could have reasonably and permissibly inferred that the wound was intentionally self-inflicted and thus by definition suicide. With a question of fact clearly presented, it became the duty of the trial judge to instruct the jury as to the evidentiary value of the presumption. His failure to do so was reversible error under the rule of *Wood* as we understand it.

We do not undertake to prescribe the instruction in every case in which a recognized presumption is involved. In the case at bar we hold that the jury should have been instructed that they were to consider the presumption against suicide and accord to it the weight they chose in the same manner as they weighed every other element of substantive evidence.

We add a *caveat*. The presumption cannot be used evidentiarily twice. In this case, as in every case, the burden of proof was on the party asserting the claim. The claim was accidental death by gunshot wound. If, after actual evidence had been introduced to support this theory and the presumption considered, the evidentiary scales were equipoised, plaintiffs' case would of necessity fall for they would not have sustained their burden of proof.

Because we reverse and remand, we must address ourselves to plaintiffs' second specification of error. This is the trial court's allowance of the question to the minister and his answer to the question, as hereinbefore set out. We hold the question and the

answer to have been improper and the allowance thereof was additional reversible error. The statute governing such testimony is MCLA § 600.2156 (Stat Ann 1962 Rev § 27A.2156).

"No minister of the gospel, or priest of any denomination whatsoever, or duly accredited Christian Science practitioner, shall be allowed to disclose any confessions made to him in his professional character, in the course of discipline enjoined by the rules or practice of such denomination."

The minister was a competent witness. The statute does not bar testimony by a clergyman with knowledge of relevant and admissible facts as such. It does bar any confessions made to him in his professional character. In ordinary everyday parlance, the import of the question simply was, "Did Bruce tell you whether or not he intentionally shot himself"? The question and the answer thereto were highly improper. We agree with the argument of appellants that the effect upon the jury of the question and answer was, "I know what really happened because Bruce told me, but because of a rule of evidence I can't divulge it". The impact on the lay mind could have been as devastating one way as the other. The jury was left to speculate on whether the deceased said that the gun went off accidentally or that he shot himself intentionally. We are not able to say that all of the other circumstantial proofs did not become subordinate to this one speculative inquiry.

We can find no relevance in a question, the answer to which is in effect, "Yes, I have relevant knowledge, but I cannot testify to it". The evidence was not excepted from the statute by the rule of admissibility against interest; the deceased was not a party to the action.

Appellants further contend that a portion of the defendant's closing argument was improper. The argument was directed to the fact that it was the duty of the company to contest any claims which in its judgment were not a proper liability under the policy. So it is. This much of the argument was proper. However, when counsel queried of the jury, "what would *your* policy be worth upon your *death*", (if the company paid all claims made), he exceeded permissible limits. We do not address ourselves to the precise point decisionally because it was not properly saved for review.

For the two errors specified, we reverse and remand. Costs to the plaintiffs.

All concurred.