PEOPLE v BRAGG

Docket No. 305140. Submitted February 9, 2012, at Detroit. Decided May 8, 2012, at 9:00 a.m.

Samuel D. Bragg was charged in the 34th District Court with first-degree criminal sexual conduct. At the preliminary examination, evidence was presented that in 2007 he had sexually assaulted his then nine-year-old cousin. The court, Brian A. Oakley, J., bound defendant over to the Wayne Circuit Court on the charged offense, in part because of the testimony of John Vaprezsan, defendant's pastor who had testified that defendant, while still a minor, confessed the crime during a meeting with Vaprezsan, defendant, and defendant's mother. The circuit court, Cynthia Gray Hathaway, J., affirmed the bindover decision on the basis of the victim's testimony, but determined that the district court had abused its discretion by admitting the pastor's testimony in violation of the cleric-congregant privilege. The circuit court ruled that the privilege applied to exclude Vaprezsan's testimony, and the prosecution appealed.

The Court of Appeals *held*:

1. Under MCL 600.2156, a minister of the gospel, priest of any denomination, or an accredited Christian Science practitioner may not disclose confessions made to the minister, priest, or practitioner in his or her professional character, in the course of discipline enjoined by the rules or practice of the denominations. The evidentiary privilege of MCL 767.5a(2) provides that any communications between members of the clergy and members of their respective churches are privileged and confidential when those communications were necessary to enable members of the clergy to serve as such member of the clergy.

2. Both MCL 600.2156 and MCL 767.5a(2) address a witness's duty to testify upon a court's summons and those situations in which that testimony is excused or not allowed. The Legislature's use of the broad term "disclose" indicates that MCL 600.2156 precludes a cleric from revealing certain covered statements to anyone, not just before a court of law. MCL 767.5a(2) is more specific, however, and uses specific legal terms to declare that any covered communications are privileged and confidential. Reading

the statutes together, MCL 600.2156 applies only to confessions, broadly precludes a cleric from disclosing confessions in many situations, not just the courtroom, and is not an evidentiary privilege. The more specific MCL 767.5a(2), however, creates an evidentiary privilege that precludes the incriminatory use of any communication made by a congregant to his or her cleric when that communication was necessary to enable the cleric to serve as such.

3. A communication is privileged under MCL 767.5a(2) when it was necessary to enable the cleric to serve as a member of the clergy. When the communication to the cleric was made in the cleric's professional character or was made in the course of discipline enjoined by the rules or practice of the denomination, it was likely necessary to enable the cleric to serve as a cleric.

4. A communication is necessary to enable a cleric to serve as a cleric if it serves a religious function such as providing guidance, counseling, forgiveness, or discipline. A communication is made to a cleric in the cleric's professional character when it is directed to a clergyman in his or her capacity as a spiritual leader within the religious denomination, and the communication may not arise from the congregant speaking to the cleric in his or her role as a relative, friend, or employer. Guidance by a clerical witness about whether a communication would be considered confidential under the discipline or practices of a specific religion must be accepted because a court's consideration of a particular religion's stance on confidential communications and the role or duty of its clerics would offend First Amendment principles.

5. Defendant's statements to Vaprezsan were privileged and confidential communications under MCL 767.5a(2). The communication served a religious function because it enabled the pastor to provide guidance, counseling, forgiveness, and discipline to defendant. When Vaprezsan spoke with defendant in a nonsecular manner and prayed with him during the communication, he acted in his professional character as a pastor. Defendant's communication with Vaprezsan was made in the course of discipline enjoined by the Baptist Church, the denomination for which he was a pastor. Because defendant's communication with Vaprezsan was privileged and confidential, the circuit court properly precluded any further use of the evidence.

6. The evidentiary privilege of MCL 767.5a(2) applies regardless of whether the communication is initiated by the cleric or the congregant. The cleric-congregant privilege belongs to the penitent, and only he or she may waive the privilege, by, for example, giving evidence of what took place at the confessional or by sharing

the content of the otherwise privileged communication with a third party. Defendant timely asserted the cleric-congregant privilege in the district court and did nothing to expressly or implicitly waive the privilege. The presence of defendant's mother during defendant's meeting with Vaprezsan did not constitute a waiver of the cleric-congregant privilege because defendant was a minor at that time.

Affirmed.

1. EVIDENCE — PRIVILEGES — CLERIC-CONGREGANT PRIVILEGE — ADMISSION OF COMMUNICATIONS.

Under MCL 600.2156, a minister of the gospel, a priest of any denomination, or an accredited Christian Science practitioner may not disclose confessions made to the minister, priest, or any practitioner in his or her professional character, in the course of discipline enjoined by the rules or practice of the denomination; the evidentiary privilege of MCL 767.5a(2) provides that any communications between members of the clergy and members of their respective churches are privileged and confidential when those communications were necessary to enable members of the clergy to serve as a member of the clergy; MCL 600.2156 applies only to confessions, broadly precludes a cleric from disclosing confessions in many situations, not just the courtroom, and is not an evidentiary privilege; MCL 767.5a(2), however, is more specific and creates an evidentiary privilege that precludes the incriminatory use of any communication made by a congregant to his or her cleric when that communication was necessary to enable the cleric to serve as a cleric.

2. EVIDENCE — PRIVILEGES — CLERIC-CONGREGANT PRIVILEGE — COMMUNICATIONS COVERED.

A communication is privileged under MCL 767.5a(2) when it was necessary to enable the cleric to serve as a member of the clergy; if the communication to a cleric was made in his professional character or made in the course of discipline enjoined by the rules or practice of the denomination, it was likely necessary to enable the cleric to serve as a cleric; a communication would be necessary to enable the cleric to serve as a cleric when it serves a religious function such as providing guidance, counseling, forgiveness, or discipline; a communication is made to a cleric in the cleric's professional character when it is directed to a clergyman in his or her capacity as a spiritual leader within the religious denomination; the communication may not arise from the congregant speaking to the cleric in his or her role as a relative, friend, or employer; guidance by a clerical witness about whether a commu-

nication would be considered confidential under the discipline or practices of a specific religion must be accepted because consideration by a court of a particular religion's stance on confidential communications and the role or duty of its clerics would offend First Amendment principles.

3. EVIDENCE — PRIVILEGES — CLERIC-CONGREGANT PRIVILEGE — WAIVER.

The evidentiary privilege of MCL 767.5a(2) applies regardless of whether the communication is initiated by the cleric or the congregant; the privilege belongs to the penitent, and only he or she may waive the privilege, by, for example, giving evidence of what took place at the confessional or by sharing the content of the otherwise privileged communication with a third party; the presence of a minor defendant's parent during the communication does not waive the privilege.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Kym L. Worthy*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Toni Odette*, Assistant Prosecuting Attorney, for the people.

*Law Offices of Raymond A. Cassar, PLC* (by *Raymond A. Cassar*), for defendant.

Before: GLEICHER, P.J., and METER and DONOFRIO, JJ.

GLEICHER, P.J. Defendant, Samuel Dale Bragg, was bound over for trial on a first-degree criminal sexual conduct charge, based in part on the testimony of Pastor John Vaprezsan, who shared with the district court defendant's admission to having sexually assaulted defendant's then nine-year-old cousin. The circuit court quashed defendant's statement to the pastor under the cleric-congregant privilege,[1] leading to the prosecution's interlocutory application for leave to appeal. Because defendant's communication to Vaprezsan

---

[1] This privilege is known by many names, including the "priest-penitent privilege" or the "cleric-communicant privilege."

was privileged and confidential under MCL 767.5a(2), we affirm the circuit court's exclusion of that evidence from defendant's trial.[2]

It is important to note at the outset the limited nature of the issue before us for review. We are not faced with a pastor who learned of ongoing or future criminal activity and struggled over whether to report it to the authorities. We are not asked to consider whether a cleric may speak to the police concerning information conveyed with an expectation of privacy. Today, we consider only whether a cleric may reveal in court a congregant's statements made in confidence.

## I. FACTUAL AND PROCEDURAL HISTORY

In the summer of 2007, the then nine-year-old victim spent a three-day weekend at the home of her aunt, K.,[3] who lived there with her two children, then 15-year-old defendant and 10-year-old H. According to the victim, K. required her to spend the first night of her visit in the same bed as defendant. The victim awoke in the middle of the night when defendant pulled down her pants and underwear. He then penetrated her rectum with his penis. When the victim tried to yell, defendant allegedly pushed her face into a pillow and threatened to kill her if she told anyone. The second night of her visit, K. allowed the victim to share a bed with H. The victim alleged that defendant came into the room in the middle of the night while H. was sleeping. Defendant allegedly put his hand inside the victim's pants and fondled her buttocks and vaginal area. The victim told defendant to stop and moved closer to H., who did not

---

[2] Defendant does not challenge the sufficiency of the remaining evidence, and trial may proceed absent the pastor's testimony.

[3] In an attempt to protect the identity of the minor victim, we will refer to certain witnesses by initial only.

awaken. In the morning, the victim informed K. that defendant had come into H.'s room. She asked if she could sleep in K.'s room that night. K. agreed and confronted defendant, who denied having gone into H.'s room the night before. The victim testified that defendant later reminded her of his earlier threat.

The victim told no one of these events until 2009, when she was 11 years old. After hearing a church sermon on purity, the victim revealed the 2007 assaults to her mother. The victim's mother shared the information with her husband, and the family reported the events to the Belleville Police Department. The victim's family then approached Vaprezsan, the pastor of the Baptist church they attended, for counseling and advice.

Defendant and his mother, K., were parishioners at the same church. Vaprezsan had known defendant since he was five years old, and K. was employed as the church secretary. After hearing the victim's story, Vaprezsan telephoned K. and asked her to bring defendant to the church as soon as possible for a meeting. K. and defendant arrived at the church at 11 p.m., after defendant's work shift ended. Vaprezsan met with defendant and K. in his office, where he allegedly elicited defendant's confession. Vaprezsan shared the content of defendant's statements with the victim's family, who then provided the statements to the police. A Belleville police detective later contacted Vaprezsan, who furnished a written statement detailing his conversation with defendant.

The prosecution ultimately charged defendant with first-degree criminal sexual conduct in violation of MCL 750.520b. At a preliminary examination conducted before 34th District Court Judge Brian A. Oakley, the prosecution sought to introduce the pastor's testimony

regarding his conversation with defendant. Defendant objected, raising the statutory cleric-congregant privilege. Defendant contended that Vaprezsan heard defendant's statements while acting in his role as a pastor. He argued that K.'s presence did not vitiate the evidentiary privilege because defendant was a minor. The prosecutor responded that defendant's age at the time of the communication lacked relevance and the presence of a third party rendered the privilege inapplicable.

The district court adjourned the examination and requested that the parties supplement their arguments. When the hearing continued two weeks later, defendant reiterated his argument that K.'s presence in Vaprezsan's office did not eliminate the privilege. Defendant noted that Vaprezsan had summoned both K. and defendant to his office, leaving defendant no opportunity to challenge her participation. Defendant further noted that K.'s attendance was essential because he was a minor at the time of the meeting. Defendant cited *Bassil v Ford Motor Co*, 278 Mich 173, 178; 270 NW 258 (1936), overruled in part on other grounds by *Serafin v Serafin*, 401 Mich 629, 634 n 2; 258 NW2d 461 (1977), for the proposition that "the presence of one sustaining an intimate family relation" during an otherwise confidential meeting does not waive the evidentiary privilege. Defendant also raised a public policy argument premised on the danger of court invasion into religious relationships.

The prosecutor responded by referring to MCL 600.2156, which prohibits ministers from disclosing confessions. Although the prosecutor conceded that Vaprezsan was a religious minister to whom the privilege would apply under the correct circumstances, she contended that defendant's statements were not "confessions" protected by the statute because they were

made in front of a third party. The prosecutor argued that by allowing K. to attend the meeting, defendant essentially waived the privilege, negating that defendant's statements to Vaprezsan had been made in the course of discipline enjoined by the church as contemplated by MCL 600.2156. The prosecutor insisted that Vaprezsan had summoned defendant; defendant did not "seek out [Vaprezsan] to unburden his soul, to seek penance."

The district court admitted the evidence, stating:

> I don't think who . . . initiates the conversation is the end all and be all. But, I think it's an indication that this was not a communication between the defendant and his pastor, uh, where there was any discipline involved, which is required under [MCL] 600.2156. Or, that it was the type of communication that is necessary for the pastor to be a pastor, which is the definition of [MCL] 757.5a(2) [sic]. Um, the pastor's statement is; that after repeated questioning, the defendant quote, end quote, broke down. That doesn't sound like the defendant was there for, uh, any kind of forgiveness, any kind of, uh, religious counseling, or anything else.
>
> Um, quite simply, I don't think this case meets the definition of a confession in the . . . generally accepted religious, uh, definition of the word. And, as such, I'm going to allow the pastor . . . to testify today.

The pastor then took the stand and testified that he called defendant and K. into his office without forewarning them of the topic for discussion. Vaprezsan admitted that defendant and K. likely believed that they were being summoned for counseling on some issue. In response to defense counsel's inquiry, the pastor explained that he requested K.'s presence during the meeting even though it was not required because defendant was a minor and it was "the right thing to do."

Once inside his office, Vaprezsan shared the information he had learned from the victim "to find out . . . from [defendant] . . . if this did occur" and, if so, "to deal with . . . the aftermath." During the conversation, Vaprezsan was "upset" and "very controlling" because he "was angry at the sin and what sin causes." Vaprezsan denied "screaming" at defendant, claiming that he approached the situation as "a loving broken hearted pastor." The first step "to get[ting] some help" was to uncover the truth. Vaprezsan testified that defendant initially denied the allegations. Vaprezsan "reasoned with" defendant, asking him why his cousin would fabricate such a story. Defendant allegedly broke down, began to weep and admitted the accuracy of the details provided by the victim. Vaprezsan consoled defendant "with [his] spirit, with [his] attitude, with [his] love for [defendant]." During this interview, K. remained in the room, "[q]uiet and weeping." When the interview was over, Vaprezsan prayed with defendant and K., and "asked God to - - to help us through this and help [defendant]."

Defense counsel questioned the pastor about the Baptist Church's position on "keeping confidences." Vaprezsan, who had been a pastor for 38 years, replied that he was taught that "[t]here's no need in others knowing personal matters, that are discussed with me." Vaprezsan stated that confidentiality is a key to promoting communications between clergy and congregants and that he had preached his duty of confidentiality from the pulpit. The prosecutor inquired, "[U]nder the Baptist doctrine, under your church rules, would this communication that you had with him, and the nature how the communication came about, would that be . . . considered a confidential communication?" Vaprezsan responded, "I'm

sure it would." He immediately qualified his statement, indicating that disclosing the "confidential" communication with the victim's family and the police was not a violation of Baptist doctrine and was "the right thing to do." Vaprezsan indicated that part of dealing with the "aftermath" was to notify the victim's family of defendant's admission so that they could pursue legal recourse. The prosecutor also asked Vaprezsan if he had shared "what had happened . . . in this meeting with anyone else." The pastor replied: "No. I didn't, uh - - no. That's - - that's a private matter that I did not share, that I can recall, with anyone else. I don't even share things like that with my wife."

At the close of the pastor's testimony, defense counsel renewed the motion to exclude the evidence, arguing:

> He's clearly testified to you that he was in the role of the pastor. And, his role was to counsel [defendant], and counsel [K.], in the role acting as pastor. Not acting as he would put it, in the role of a police officer. He was there acting in the role of pastor; I wanted to console him, I wanted to find out what had happened. At the church, a meeting with a member of his congregation, that he's known since he was five, and his mother.

> Your Honor, this falls squarely within . . . [the] priest-penitent privilege.

The district court denied defendant's renewed motion. K. then took the stand and rebutted the pastor's version of events. She claimed that Vaprezsan called her and defendant into his office, where he accused defendant of touching the victim inappropriately. K. asserted that Vaprezsan stood close to defendant, yelling in his face and claiming to know his guilt. K. stressed that defendant never confessed to any crime.

The district court bound defendant over to the circuit court for trial. When arguing in favor of the bindover,

the prosecution relied on the victim's testimony "coupled with the . . . other evidence that" had been placed before the court, "particularly [the testimony] of the pastor:"

> A man of God, um, to suggest that he's lied to the police, lied to this Court while under oath, when he has absolutely nothing to gain by becoming involved in this. Um, in fact he said that he loves the defendant and forgives him, um, is just absolutely unfounded at this point. Um, clearly the mother's testimony is what it is. But, I would submit that she clearly has a - - a motive to, um, assist her son and a mo - - motive to lie. And clearly, both of them can't be correct.
>
> The pastor and the mom, one of them is completely lying about what happened during that, um, conversation. Um, but for those reasons, I believe there's sufficient evidence to bind over . . . .

At a pretrial conference, Wayne Circuit Court Judge Cynthia Gray Hathaway approved the bindover, concluding that the victim's testimony was sufficient to support the elements of the charged offense. However, the circuit court determined that the district court had abused its discretion by admitting the pastor's testimony in violation of the cleric-congregant privilege. The circuit court ruled that the privilege applied to exclude Vaprezsan's testimony regarding defendant's alleged statements to him as follows:

> I'm going to move on to the clergy-penitent privilege. And I'm not going to waste any time with it. I do believe that there was an abuse of discretion in that regard.
>
> And I think it occurred because the Magistrate failed to take an offer of proof before making his findings, and giving his decision that there was no privilege.
>
> When you read the Preliminary Examination testimony of the Pastor, in my mind, when you think about the purpose and goal of the First Amendment Separation of

Church and State, I think that there was a clear privilege there, with the communication that was given to the Pastor.

It doesn't make sense to me that the things that you both talked about, about the age of the defendant, the fact that his mother was present, or the fact that anybody else was present, the fact that the defendant did not go to the Pastor on his own initiative, none of those things I think are relevant.

What's relevant is that the Pastor, I'm sure, called in - - in fact he testified that he wanted to counsel and discuss this sin. And that's all very religious in nature.

That he also wanted to help both sides, both families. And that the whole purpose of having all of them there was to have a religious session.

So, I think that a ruling that there was a violation of the clergy-penitent privilege is more consistent with the separation of Church and State goal than there was not.

Rather than proceeding to trial without the pastor's testimony, the court stayed the proceedings to allow the prosecution to seek this appeal. We subsequently granted the prosecution's delayed application for leave to appeal in this Court. *People v Bragg*, unpublished order of the Court of Appeals, entered September 8, 2011 (Docket No. 305140).

We reemphasize the narrowness of the question before us. We are not faced with a pastor who battled a dilemma about whether to report child sexual abuse; the victim's family had already contacted the authorities to accuse defendant of the assault. Moreover, the crime had occurred in the past, so we are not asked to consider whether a pastor may breach a confidence to prevent a future crime. We are not asked to determine whether the pastor was permitted to reveal defendant's statements to the police; indeed, that bell cannot be unrung. Rather, we consider only whether the pastor

may give testimony against his congregant, either voluntarily or by court order, disclosing statements made in confidence.

## II. STANDARD OF REVIEW

We generally review a trial court's evidentiary rulings for an abuse of discretion. *People v Layher*, 464 Mich 756, 761; 631 NW2d 281 (2001). A trial court abuses its discretion when its ruling falls outside the range of principled outcomes. *People v Feezel*, 486 Mich 184, 192; 783 NW2d 67 (2010). The underlying question regarding the statutory privilege is a mixed question of fact and law. *Centennial Healthcare Mgt Corp v Dep't of Consumer & Indus Servs*, 254 Mich App 275, 284; 657 NW2d 746 (2002). Specifically, we must review de novo the relevant statutes in an attempt to discern the Legislature's intent from the text's plain and unambiguous language. *People v Williams*, 294 Mich App 461, 474; 811 NW2d 88 (2011).

When interpreting and applying a statutory privilege, we must remember that "[t]estimonial exclusionary . . . privileges contravene the fundamental principle that 'the public . . . has a right to every man's evidence' " and therefore "must be strictly construed." *Trammel v United States*, 445 US 40, 50; 100 S Ct 906; 63 L Ed 2d 186 (1980), quoting *United States v Bryan*, 339 US 323, 331; 70 S Ct 724; 94 L Ed 884 (1950); see also *People v Warren*, 462 Mich 415, 427; 615 NW2d 691 (2000) ("Privileges are narrowly defined and their exceptions broadly construed."). As noted by our Supreme Court in *People v Stanaway*, 446 Mich 643, 658; 521 NW2d 557 (1994):

> Unlike other evidentiary rules that exclude evidence because it is potentially unreliable, privilege statutes shield potentially reliable evidence in an attempt to foster rela-

tionships. . . . While the assurance of confidentiality may encourage relationships of trust, privileges inhibit rather than facilitate the search for truth. . . . Privileges therefore are not easily found or endorsed by the courts. "The existence and scope of a statutory privilege ultimately turns on the language and meaning of the statute itself." *Howe v Detroit Free Press*, 440 Mich 203, 211; 487 NW2d 374 (1992). Even so, the goal of statutory construction is to ascertain and facilitate the intent of the Legislature.

As our Supreme Court similarly held in *Warren*, 462 Mich at 428, quoting 1 McCormick, Evidence (5th ed), § 72, pp 298-299:

"The overwhelming majority of all rules of evidence have as their ultimate justification some tendency to promote the objectives set forward by the conventional witness' oath, the presentation of 'the truth, the whole truth, and nothing but the truth.' . . . By contrast the rules of privilege . . . are not designed or intended to facilitate the fact-finding process or to safeguard its integrity. Their effect instead is clearly inhibitive; rather than facilitating the illumination of truth, they shut out the light."

### III. HISTORY OF THE CLERIC-CONGREGANT PRIVILEGE

Although sometimes classified as a common-law principle, the cleric-congregant privilege was not actually recognized in the common law of Anglican England or colonial America. *Cox v Miller*, 296 F3d 89, 102 (CA 2, 2002); *In re Grand Jury Investigation*, 918 F2d 374, 381 n 10 (CA 3, 1990); 8 Wigmore, Evidence (McNaughton rev), § 2394, p 870. The privilege arose from the papal law of the Roman Catholic Church, under which the "seal of the Confessional" was sacrosanct and any priest's violation of confidence was cause for excommunication. Mitchell, *Must clergy tell? Child abuse reporting requirements versus the clergy privilege and free exercise of religion*, 71 Minn L R 723, 735-736 (1987).

After the Protestant Reformation, however, the use of religious privileges in courts of law fell out of favor. Wigmore, § 2394, pp 869-870; Mitchell, pp 736-737.

The first American court to recognize a clergyman's privilege was the New York Court of General Sessions, which decided the case of *People v Phillips* in 1813.[4] In *Phillips*, a New York state court attempted to make a Catholic priest a witness based on information gleaned from the confessional. The priest responded that had he learned the information in his capacity "as a private individual," he would readily testify before the court. Sampson, *The Catholic Question in America* (1813), p 8. As he had learned the requested information during the sacrament of confession, the priest refused to reveal the source or the content lest he "become a traitor to [his] church" and "render [him]self guilty of eternal damnation." *Id.* at 9. The court acknowledged the "dreadful predicament" and "horrible dilemma" the subpoena had thrust upon the priest:

> If he tells the truth he violates his ecclesiastical oath—If he prevaricates he violates his judicial oath—Whether he lies, or whether he testiffies (sic) the truth he is wicked, and it is impossible for him to act without acting against the laws of rectitude and the light of conscience. [*Id.* at 103.]

The court's answer was "to declare that [the priest] shall not testify or act at all." *Id.*

The *Phillips* court rested its decision on the First Amendment of the United States Constitution: " 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' " *Id.* at 111. The court proceeded to describe the sacramental

---

[4] *People v Phillips* was an unpublished case but was reported in full by the priest's attorney in his book: Sampson, *The Catholic Question in America* (1813), pp 1-122.

differences between Catholicism and Protestantism to
explain why specifically a Catholic priest should not be
forced to testify regarding the content of a confession:

> It is essential to the free exercise of a religion, that its
> ordinances should be administered—that its ceremonies as
> well as its essentials should be protected. The sacraments
> of a religion are its most important elements. We have but
> two in the Protestant Church—Baptism and the Lord's
> Supper—and they are considered the seals of the covenant
> of grace. Suppose that a decision of this court, or a law of
> the state should prevent the administration of one or both
> of these sacraments, would not the constitution be violated,
> and the freedom of religion be infringed? Every man who
> hears me will answer in the affirmative. Will not the same
> result follow, if we deprive the Roman catholic of one of his
> ordinances? Secrecy is of the essence of penance. The
> sinner will not confess, nor will the priest receive his
> confession, if the veil of secrecy is removed: To decide that
> the minister shall promulgate what he receives in confes-
> sion, is to declare that there shall be no penance; and this
> important branch of the Roman catholic religion would be
> thus annihilated. [*Id.*]

Today we perceive a twofold danger in the *Phillips*
court's rationale. First, as noted by the *Phillips* pros-
ecution, the distinction between religions seems to
serve as a "preference," allowing only Catholic peni-
tents the armor of privilege. See *id.* at 48. Second, by
focusing so deeply on the nature of the religious rite, the
court, an arm of the government, immersed itself in a
doctrinal debate of the most sensitive nature. In the
nearly 200 years since *Phillips* was decided, all 50 states
have enacted statutes or evidentiary rules, and the
federal government has accepted as a part of its com-
mon law, regulations that resolve the first danger—
everywhere in this nation, any penitent speaking to any
clergyman of any denomination enjoys an evidentiary
privilege precluding the use in court of his or her

"confession," or sometimes more broadly the penitent's "communication."[5] By adopting rules of privilege, the states and federal government have rendered unnecessary further inquiry into religious doctrine.

In 1846, a mere nine years after Michigan was admitted to statehood, our Legislature enacted the

---

[5] Under the Federal Rules of Evidence, the privilege of a witness is governed by the common law unless the United States Constitution, a federal statute, or a United States Supreme Court rule provides otherwise. FRE 501. Several United States circuit courts of appeals have expressly addressed the issue of cleric-congregant communications and found a common-law privilege. See *Varner v Stovall*, 500 F3d 491, 495-496 (CA 6, 2007); *Cox*, 296 F3d at 102-105; *Mockaitis v Harcleroad*, 104 F3d 1522, 1531-1533 (CA 9, 1997); *Grand Jury Investigation*, 918 F2d at 378-385; *United States v Dube*, 820 F2d 886, 889-890 (CA 7, 1987).

Our sister states have all enacted statutes or court rules governing the cleric-congregant privilege: (Alabama) Ala R Evid Rule 505; (Alaska) Alas R Evid 506; (Arizona) Ariz Rev Stat Ann 13-4062; (Arkansas) Ark R Evid 505; (California) Cal Evid Code 917, 1033, 1034; (Colorado) Colo Rev Stat 13-90-107; (Connecticut) Conn Gen Stat Ann 52-146b (2012); (Delaware) Del R Evid 505; (Florida) Fla Stat 90.505; (Georgia) Ga Code Ann 24-9-22; (Hawaii) Hawaii R Evid 506; (Idaho) Idaho Code Ann 9-203; Idaho R Evid 505; (Illinois) 735 Ill Comp Stat 5/8-803; (Indiana) Ind Code 34-46-3-1; (Iowa) Iowa Code 62.10(1); (Kansas) Kan Stat Ann 60-429; (Kentucky) Ky R Evid 505; (Louisiana) La Code Evid Ann art 511; (Maine) Me R Evid 505; (Maryland) Md Code Ann, Cts & Jud Proc 9-111; (Massachusetts) Mass Gen Laws ch 233, § 20A; (Minnesota) Minn Stat 595.02; (Mississippi) Miss R Evid 505; (Missouri) Mo Rev Stat 491.060; (Montana) Mont Code 26-1-804; (Nebraska) Neb Rev Stat 27-506; (Nevada) Nev Rev Stat 49.255; (New Hampshire) NH R Evid 505; (New Jersey) NJ Stat Ann 2A:84A-23; (New Mexico) NM R Evid 11-506; (New York) NY CPLR 4505; (North Carolina) NC Gen Stat 8-53.2; (North Dakota) ND R Evid 505; (Ohio) Ohio Rev Code Ann 2317.02; (Oklahoma) Okla St tit 12, § 2505; (Oregon) Or Rev Stat 40.260; (Pennsylvania) 42 Pa Cons Stat 5943; (Rhode Island) RI Gen Laws 9-17-23; (South Carolina) SC Code Ann 19-11-90; (South Dakota) SD Codified Laws 19-13-16 and 19-13-17; (Tennessee) Tenn Code Ann 24-1-206; (Texas) Tex R Evid 505; (Utah) Utah Code Ann 78B-1-137, Utah R Evid 503; (Vermont) Vt Ct R Ann 505; (Virginia) Va Code Ann 8.01-400; (Washington) Wash Rev Code 5.60.060; (West Virginia) W Va Code 48-1-301; (Wisconsin) Wis Stat 905.06; (Wyoming) Wy Stat Ann 1-12-101.

precursor of the modern MCL 600.2156.[6] That statute now provides:

> No minister of the gospel, or priest of any denomination whatsoever, or duly accredited Christian Science practitioner, shall be allowed to disclose any confessions made to him in his professional character, in the course of discipline enjoined by the rules or practice of such denomination.[7]

More than 100 years later, in 1949, the Michigan Legislature enacted the evidentiary privilege of MCL 767.5a(2), which now provides:

> Any communications between attorneys and their clients, *between members of the clergy and the members of their respective churches*, and between physicians and their patients are hereby *declared to be privileged and confidential when those communications were necessary to enable* the attorneys, *members of the clergy*, or physicians *to serve as such* attorney, *member of the clergy*, or physician. [MCL 767.5a(2), as amended by 1986 PA 293 (emphasis added).]

IV. WHEN THE PRIVILEGE APPLIES UNDER MICHIGAN LAW

Both the prosecution and the defense focus their arguments on the elements of MCL 600.2156, which governs a cleric's disclosure of confessions. We find such a limited view inappropriate. MCL 767.5a is a more recent enactment and more specifically governs the evidentiary use of a "privileged and confidential" communication.

We begin by outlining the rules of statutory interpretation relevant to our analysis. MCL 600.2156 and MCL 767.5a(2) relate to a similar subject matter and share a

---

[6] 1846 RS, ch 102, § 85.

[7] MCL 600.2156, as amended by 1962 PA 187. The Legislature's only alteration since enacting the 1846 statute was to include "duly accredited Christian Science practitioner[s]" within the statutory ambit.

similar goal—to protect the secrecy of statements made by a congregant to his or her cleric. "[S]tatutes that relate to the same subject or that share a common purpose are *in para materia* [sic] and must be read together as one." *People v Buehler*, 477 Mich 18, 26; 727 NW2d 127 (2007) (quotation marks and citation omitted). If the two statutes appear to conflict, however, a newer statute prevails over the older. This is because " 'the Legislature is presumed to be aware of, and thus to have considered the effect on, all existing statutes when enacting new laws.' " *Feezel*, 486 Mich at 211 (citation omitted). We remain mindful that seemingly similar statutes may govern under very different circumstances. In *Grimes v Dep't of Transp*, 475 Mich 72, 85; 715 NW2d 275 (2006), for example, our Supreme Court cautioned against importing definitions from the Michigan Vehicle Code, MCL 257.1 *et seq.*, into the highway exception to governmental immunity, MCL 691.1402, as the two statutes serve very different purposes. Specifically, the Supreme Court warned that "reliance on an unrelated statute to construe another is a perilous endeavor to be avoided by our courts." *Grimes*, 475 Mich at 85. Further, when two statutes appear to control a particular situation, the more recent and more specific statute applies. *Buehler*, 477 Mich at 26.

The statutes at issue fall within two separate codes within our compiled laws. MCL 600.2156, the successor of this state's original 1846 statute, is found among the evidence provisions of chapter 21 of the Revised Judicature Act, MCL 600.2101 *et seq*. It is flanked by statutes excusing a witness from giving an answer that may incriminate him criminally, MCL 600.2154, and describing the circumstances under which a patient waives a doctor-patient privilege, MCL 600.2157. MCL 767.5a, on the other hand, is part of chapter VII of the

Code of Criminal Procedure, MCL 767.1 *et seq*. The chapter heading indicates that it contains statutes governing "grand juries, indictments, informations and proceedings before trial." MCL 767.5a is flanked by statutes governing the contempt of witnesses who fail to appear or refuse to answer questions, MCL 767.5, and permitting witnesses to avoid self-incrimination absent a grant of immunity, MCL 767.6. MCL 600.2156, MCL 767.5a, and their neighboring statutes all deal with a single, general concept—a witness's duty to testify upon summons from the court and the situations under which a witness may not, cannot, or is excused from testifying as otherwise directed. These are not wholly unrelated statutes as described in *Grimes*, 475 Mich at 85, and therefore must be read in harmony. *Manning v East Tawas*, 234 Mich App 244, 249; 593 NW2d 649 (1999), citing *Jennings v Southwood*, 446 Mich 125, 136-137; 521 NW2d 230 (1994).

Pursuant to MCL 600.2156, a cleric is not permitted to "disclose" certain statements made to him or her. To "disclose" means to "bring into view by uncovering; to expose; to make known . . . ." Black's Law Dictionary (6th ed), p 464; see also *Webster's New World Dictionary of the American Language* (2d college ed), p 401. The Legislature's use of the broad term "disclose" precludes a cleric from revealing the covered statements to anyone, not simply before a court of law.

MCL 767.5a(2), on the other hand, uses more specific legal terms by "declar[ing]" any covered communication "to be privileged and confidential." In legal parlance, "privileged communications" are "[t]hose statements made by certain persons within a protected relationship such as . . . priest-penitent . . . which the law protects from forced disclosure on the witness stand . . . ." Black's (6th ed), p 1198; see also *Webster's*,

p 1131 (stating that a "privileged communication" is a statement "that one cannot legally be compelled to divulge, as that to a lawyer from his client"). "Confidential communication[s]" include "[p]rivileged communications such as those between . . . confessor-penitent" but also include "statement[s] made under circumstances showing that [the] speaker intended [the] statement only for [the] ears of [the] person addressed . . . ." Black's (6th ed), p 298; see also *Webster's*, p 297 (stating that "confidential" means "told in confidence; imparted in secret").

Read together and harmonized, the more specific MCL 767.5a(2) creates an evidentiary privilege, precluding the incriminatory use of "any communication" made by a congregant to his or her cleric when that communication was "necessary to enable the" cleric "to serve as such" cleric. That statute governs the specific use of a defendant's statements against him or her in court. MCL 600.2156 more broadly precludes a cleric from disclosing certain covered communications in other situations, not limited to the courtroom. It does not qualify as an evidentiary privilege.

The evidentiary privilege enacted by the Legislature is broader than MCL 600.2156 in one important sense. MCL 600.2156 only precludes the disclosure of "confessions," while the evidentiary privilege of MCL 767.5a(2) addresses the use of "any communication."[8] Accord-

---

[8] We note that this Court improperly omitted a discussion of MCL 767.5a in *Wirtanen v Prudential Life Ins Co of America*, 27 Mich App 260; 183 NW2d 456 (1970), and therefore reached an incomplete conclusion regarding the admissibility of a Lutheran minister's testimony. The *Wirtanen* plaintiffs brought suit to collect under their deceased son's life insurance policy. *Id.* at 262. The deceased had died several days after suffering a self-inflicted gunshot wound. The plaintiffs claimed accidental death, which was covered by the policy, but the insurance company claimed suicide, which was not. *Id.* at 262-264. In support of its suicide

ingly, contrary to the arguments of the prosecution and the defense, it is irrelevant whether defendant's statements to Vaprezsan fall within the definition of a confession. The provisions of MCL 600.2156 are useful, however, in determining when a communication is necessary to enable a cleric to serve as a cleric. For instance, a communication is likely necessary to allow a cleric to serve as a cleric if the statement is made to the cleric in his or her professional capacity or is made "in the course of discipline enjoined by the rules or practice of" the cleric's denomination.

## V. WHEN A COMMUNICATION IS PRIVILEGED UNDER MCL 767.5a(2)

### A. NECESSARY TO ENABLE THE CLERIC TO SERVE AS A CLERIC

For the evidentiary privilege of MCL 767.5a(2) to apply, the communication must have been "necessary to enable" Vaprezsan "to serve as such . . . member of the clergy." This phrase has never been defined by this Court or the Michigan Supreme Court. We find guidance in the attempts of our sister states and the federal courts to define the parameters of their own statutes

claim, the insurance company presented the testimony of a minister who had visited the deceased in the hospital. The trial court permitted the insurer to ask the minister whether the deceased had told him what had happened, and the minister responded in the affirmative. The court did not permit the insurer to elicit the contents of that conversation. *Id.* at 264–265. This Court held that the question improperly left the jury to speculate. *Id.* at 269. In relation to MCL 600.2156, this Court held: "The minister was a competent witness. The statute does not bar testimony by a clergyman with knowledge of relevant and admissible facts as such. It does bar any confessions made to him in his professional character." *Id.* Had this Court properly considered MCL 767.5a as well, it could have noted that any communication, not just a confession, would be barred from the trial as long as the communication was necessary to allow the minister to serve as a minister. As *Wirtanen* was decided before November 1, 1990, we are not limited by its incomplete analysis. MCR 7.215(J)(1).

and common-law rules. From those cases, we glean that a communication is necessary to enable a cleric to serve as a cleric if the communication serves a religious function such as providing guidance, counseling, forgiveness, or discipline.

In *Cox*, 296 F3d at 106, the United States Court of Appeals for the Second Circuit directed that "a communication must be made in confidence and for the purpose of obtaining spiritual guidance" in order to be privileged. (Quotation marks and citation omitted.) Put another way, a conversation is not privileged if made "with wholly secular purposes solely because one of the parties to the conversation happens to be a religious minister." *Id.* (quotation marks and citation omitted). In *Cox*, the defendant told seven members of his Alcoholics Anonymous (AA) group that he had broken into a house six years earlier and murdered the residents. *Id.* at 91. The defendant alleged that he made these "confessions" as part of the fourth and fifth steps of the AA program: "to undertake 'a searching and fearless moral inventory' and to 'admit[] to God, to [himself], and to another human being the exact nature of [his] wrongs.'" *Id.* The *Cox* panel assumed that AA qualified as a religion, *id.* at 107, but rejected the defendant's claim that his statements were made to fellow members to seek spiritual guidance. Rather, the defendant's statements to his fellow AA members were made for secular purposes, such as an "emotional outpouring to a lover," pursuing advice on the procedural method of "handl[ing] the fourth step" of the program, and seeking "practical and legal, not spiritual, advice." *Id.* at 110.

The Utah Supreme Court in *Scott v Hammock*, 870 P2d 947, 956 (Utah, 1994), similarly held that the term "confession" as used in that state's statute included communications "made in confidence and for the pur-

pose of seeking or receiving religious guidance, admonishment, or advice . . . ." The court acknowledged that a cleric, serving in the role of a cleric, must engage in many communications that would not necessarily be deemed a "confession" but should nevertheless fall within the privilege.

> [A] constricted interpretation of the privilege does not take into account the essential role that clergy in most churches perform in providing confidential counsel and advice to their communicants in helping them to abandon wrongful or harmful conduct, adopt higher standards of conduct, and reconcile themselves with others and God. Indeed, even when confession is part of an essential sacrament, as in the Catholic Church, clergy must still give confidential guidance concerning the moral faults of their parishioners pursuant to their responsibility to give spiritual and religious advice, counsel, and admonishment. In counseling parishioners in religious and moral matters, clergy frequently must deal with intensely private concerns, and parishioners may be encouraged, and even feel compelled, to discuss their moral faults. . . . "Because most churches do not set aside formal occasions for special private encounters labeled 'confession,' less formal consultation must be privileged if the privilege is not in effect to be limited to Roman Catholics." [*Id.* at 952 (citations omitted).]

In *Scott*, the Utah Supreme Court held that the defendant's statements to his Church of Jesus Christ of Latter-Day Saints (LDS) bishop made during conversations tied to the church's "repentance process" "concerned an issue pertaining to [the defendant's] moral conduct" and were made to the bishop "acting in his role as a cleric." *Id.* at 956.

### B. COMMUNICATION TO A CLERIC IN HIS OR HER "PROFESSIONAL CHARACTER"

As noted, the elements of MCL 600.2156 are also useful in determining whether a communication is

necessary to enable a cleric to serve as a cleric. Particu-
larly, if a congregant imparts a communication to a
cleric in the cleric's "professional character," that com-
munication is likely "necessary to enable" the cleric to
serve as a cleric. "The 'professional character' element
requires the communication to be directed to a clergy-
man in his or her capacity as a spiritual leader within
his or her religious denomination." *State v Archibeque*,
223 Ariz 231, 235; 221 P3d 1045 (Ariz App, 2009). In
*Archibeque*, the defendant admitted to his LDS bishop
that he had sexually assaulted his stepdaughter. *Id.* at
233-234. The Arizona Court of Appeals held that the
statement was made to the bishop in his professional
character because the defendant spoke with the bishop
as part of the church's repentance process. *Id.* at 235.

In *In re Roman Catholic Archbishop of Portland*, 335
BR 815, 829 (D Or, 2005), a bankruptcy judge found the
phrase "professional character" to be ambiguous. Not-
ing that the purpose of the privilege was to "allow[] and
encourage[] individuals to fulfill their religious, emo-
tional or other needs," the judge determined that the
privilege should only protect communications to a cleric
acting as "a spiritual advisor." *Id.* at 829-830. In reach-
ing this determination, the judge cited several examples
of communications that had been deemed outside a
cleric's professional capacity. *Id.* at 830, citing *Masquat
v Maguire*, 1981 OK 137; 638 P2d 1105, 1106 (1981)
(concluding that the plaintiff hospital employee com-
municated with a Catholic nun in her capacity as
hospital administrator, not in her religious role, so the
communication was not within the privilege), *Bonds v
State*, 310 Ark 541, 544-546; 837 SW2d 881 (1992)
(determining that the defendant's communication with
a minister who was also the defendant's employer at an
air conditioning business was made to the minister in
his capacity as an employer, not as a spiritual advisor),

and *State v Cary*, 331 NJ Super 236, 246-247; 751 A2d 620 (2000) (noting that the defendant had no reasonable expectation of privacy when his conversation with the church deacon occurred after the defendant was ready to surrender and the deacon had introduced himself as a state trooper, advised the defendant of his right to remain silent, and conducted a pat-down search). See also *State v Martin*, 137 Wash 2d 774, 785 n 65; 975 P2d 1020 (1999), citing *People v McNeal*, 175 Ill 2d 335, 358-359; 677 NE2d 841 (1997) (noting that although the defendant's brother was a minister, the communication was not made to the brother in his ministerial capacity, as evidenced by the brother grabbing the defendant, eliciting an admission, and promptly ending the conversation), and *State v Barber*, 317 NC 502; 346 SE2d 441 (1986) (concluding that the defendant's confession was made to a friend and co-worker and not in connection with the friend's role as a former minister).

In *Vickers v Stoneman*, 73 Mich 419, 423-424; 41 NW 495 (1889) (CAMPBELL, J., concurring), a minority of our Supreme Court more generally noted that "[o]ne O. S. Paddock, a minister, who visited defendant in that capacity, related conversations directly connected with defendant's religious experiences." The concurring justices opined that this evidence was privileged because it had been imparted to the minister in his professional character and should not have been admitted to prove publication of slander.

Our canvass of relevant caselaw can be reduced to one essential and basic maxim: For a communication to be made to a cleric in his or her professional capacity, the congregant must speak to the cleric as part of the cleric's "job" as a cleric. The congregant cannot speak to the cleric

in his or her role as a relative, friend, or employer and receive the benefit of the evidentiary privilege.

A communication made as part of the discipline enjoined by the cleric's denomination would also likely be "necessary to enable" a cleric to serve as a cleric.[9] This element poses the danger, however, of improperly invoking the court's consideration and determination of a religion's parameters. In civil matters, the United States Supreme Court has repeatedly instructed that our secular judiciary must avoid resolving controversies about a religion's or church's internal governance or operating procedures. See *Hosanna-Tabor Evangelical Lutheran Church & Sch v Equal Employment Opportunity Comm*, 565 US ___; 132 S Ct 694; 181 L Ed 2d 650 (2012); *Serbian Eastern Orthodox Diocese for the United States of America & Canada v Milivojevich*, 426 US 696; 96 S Ct 2372; 49 L Ed 2d 151 (1976). Our consideration of a particular religion's stance on confidential communications and the role or duty of its clerics would similarly offend First Amendment principles. Accordingly, when considering whether a communication would be considered confidential under the discipline or practices of a specific religion, we are bound to accept the guidance provided by the clerical witness without embarking on a fact-finding mission.

To the extent that we may consider whether a communication was made in the course of discipline enjoined by the rules or practice of a particular denomi-

---

[9] In *People v Pratt*, 133 Mich 125, 133; 94 NW 752 (1903), our Supreme Court noted in dicta that a "confession[] of crime made . . . to a priest, not in accordance with the discipline of his church, would be competent" evidence.

nation, we find instructive *In re Contempt of Swenson*, 183 Minn 602, 604-605; 237 NW 589 (1931), which held:

The word "discipline" has various meanings. It may relate to education. It involves training and culture. It may mean training in moral rectitude, and it was probably in part so used here. It may refer to rules and duties. The word has no technical, legal meaning and in its common and most general sense signifies instruction, comprehending the communication of knowledge and training, to observe and act in accordance with certain rules or practice, and may include correction. The "discipline enjoined" includes the "practice" of all clergymen to be trained so as to advance such "discipline," to be alert and efficient in submission to duty, to concern themselves in the moral training of others, to be as willing to give spiritual aid, advice or comfort as others are to receive it, and to be keenly concerned in reformatory methods of correction leading towards spiritual confidence. So it is in the course of "discipline enjoined" by the "practice" of their respective churches that the clergyman is to show the transgressor the error of his way; to teach him the right way; to point the way to faith, hope, and consolation; perchance, to lead him to seek atonement.

The statute has a direct reference to the church's "discipline" of and for the clergyman and as to his duties as enjoined by its rules or practice. It is a matter of common knowledge, and we take judicial notice of the fact, that such "discipline" is traditionally enjoined upon all clergymen by the practice of their respective churches. Under such "discipline" enjoined by such practice all faithful clergymen render such help to the spiritually sick and cheerfully offer consolation to suppliants who come in response to the call of conscience. The courts also take judicial notice of the numerous sects and the general doctrine maintained by each.

It is important that the communication be made in such spirit and within the course of "discipline"; and it is sufficient, whether such "discipline" enjoins the clergyman to receive the communication or whether it enjoins the

other party, if a member of the church, to deliver the communication. Such practice makes the communication privileged, when accompanied by the essential characteristics, though made by a person not a member of the particular church or of any church. [Citations omitted.]

Interpreting a similarly worded statute, the Washington Supreme Court approved the Washington Court of Appeals' determination that "it is the 'clergy member receiving the confidential communication [who must] be enjoined by the practices or rules of the clergy member's religion to receive the confidential communication and to provide spiritual counsel' . . . ." *Martin*, 137 Wash 2d at 784 (citation omitted) (alteration in original). In describing the general scope of the course of discipline, the Utah Supreme Court hesitated to define the phrase too strictly lest it inadvertently show preference to one religion over another and thereby violate the Establishment Clause:

[A] constricted interpretation of the privilege does not take into account the essential role that clergy in most churches perform in providing confidential counsel and advice to their communicants in helping them to abandon wrongful or harmful conduct, adopt higher standards of conduct, and reconcile themselves with others and God. Indeed, even when confession is part of an essential sacrament, as in the Catholic Church, clergy must still give confidential guidance concerning the moral faults of their parishioners pursuant to their responsibility to give spiritual and religious advice, counsel, and admonishment. In counseling parishioners in religious and moral matters, clergy frequently must deal with intensely private concerns, and parishioners may be encouraged, and even feel compelled, to discuss their moral faults. As one commentator has stated, "Because most churches do not set aside formal occasions for special private encounters labeled 'confession,' less formal consultation must be privileged if the privilege is not in effect to be limited to Roman Catholics." [*Scott*, 870 P2d at 952 (citations omitted).]

Even in a "counseling" session with a cleric, the congregant might make many "confidential" disclosures amounting to the confession of sin or other privileged communications. The informality of the meeting should not define the scope of the privilege. *Id.* at 953.

### D. DEFENDANT'S STATEMENTS TO VAPREZSAN WERE PRIVILEGED AND CONFIDENTIAL

Defendant's statements to Vaprezsan fall within the statutory scope of privileged and confidential communications under MCL 767.5a(2). The communication was necessary to enable Vaprezsan to serve as a pastor because defendant communicated with Vaprezsan in his professional character in the course of discipline enjoined by the Baptist Church.

The communication between defendant and Vaprezsan served a religious function—it enabled Vaprezsan to provide guidance, counseling, forgiveness, and discipline to defendant. Vaprezsan testified that he wanted "to get [defendant] some help," and the first step necessitated that defendant admit his actions. Vaprezsan averred that he "consoled" defendant and counseled him as "a loving broken hearted minister."

Vaprezsan also spoke with defendant in his "professional character" as a pastor. Vaprezsan explicitly stated that he "interrogate[d]" defendant "[i]n [his] role as a pastor." Once Vaprezsan convinced defendant to speak about the sexual assault, the pastor prayed with defendant. This was not a secular conversation. If Vaprezsan had not been a pastor, the communication would not have occurred. Because of Vaprezsan's authority as the church pastor, he was able to summon defendant and his mother to the church office and expect their attendance. Inside the pastor's office, the trio did not discuss secular topics such as K.'s employ-

ment at the church. They spoke only of the victim's accusation that defendant had committed a sin and a criminal act against her.

The communication was also made in the course of discipline enjoined by the Baptist Church. Vaprezsan learned during his religious training that confidential communication is essential to create trust between congregants and their minister. The Baptist Church taught Vaprezsan that "[t]here's no need in others knowing personal matters, that are discussed with" their pastor. Vaprezsan testified that under Baptist doctrine, his communication with defendant would be considered confidential, and yet Vaprezsan claimed that his sharing defendant's communication with the police and the victim's family did not violate that confidence. Vaprezsan denied that praying with his congregants was part of his "duties as a pastor" of the Baptist Church, instead characterizing his act of praying with defendant as being "part of what's right" and "very biblical." Vaprezsan also testified that providing counseling and guidance services are a part of his role as a Baptist minister.

The record clearly establishes that defendant's communication to Vaprezsan falls within MCL 767.5a(2)'s scope. The communication was therefore privileged and confidential. Vaprezsan was not permitted to divulge the content of the communication at the preliminary examination, and the circuit court correctly precluded any further use of that evidence.

### E. EFFECT OF PASTOR'S INITIATION OF CONVERSATION

Despite the obvious nature of defendant's communication, the prosecution maintains that it does not amount to a privileged "confession" because the cleric initiated the conversation, not the congregant. How-

ever, as already noted, MCL 767.5a(2) extends its privilege to covered "communications," not just confessions. The term "communication" in no way suggests that the congregant must initiate the conversation in order for the privilege to apply.

We find instructive cases from two sister states. In *State v Johnson*, 497 NYS2d 539: 115 AD2d 973 (1985), the defendant admitted to fellow members of his Muslim mosque that he had killed his wife. "Although confidential communications between a Muslim brother acting as a spiritual advisor may, in some cases, be privileged," the court held that the defendant did not communicate for "the purpose of seeking religious counsel, advice, solace, absolution or ministration." *Id.* at 539-540.

> Defendant did not initiate the conversations but, rather, they were initiated by members of the mosque who testified that they were motivated by fear that defendant might be dangerous, and their desire to get him out of the mosque. Defendant was interrogated by members of the mosque, and he denied involvement in his wife's death. Following further questioning, defendant admitted that he killed his wife. [*Id.* at 540.]

In *Johnson*, the communication was not exempted from the privilege because the defendant's Muslim brothers initiated the conversation. Rather, the communication was exempted because it was made for a secular purpose. The Muslim brothers elicited the defendant's communication because they feared for their own safety and the safety of other community members.

In *State v Diercks*, 88 Ill App 3d 1073, 1074; 411 NE2d 97 (1980), the defendant burglarized a Baptist church. The church's pastor visited the jail on three occasions to speak with the defendant. During one visit, the defendant admitted his guilt. The prosecution ar-

gued that the privilege was inapplicable because the defendant did not initiate the conversation. *Id.* at 1077. The court ultimately found the privilege inapplicable on other grounds. However, the court concluded that the identity of the initiator did not govern whether the privilege applied. *Id.*

We agree with the New York and Illinois courts that it is irrelevant to the statutory-privilege analysis that Vaprezsan initiated the conversation. Regardless of the initiator's identity, the communication was necessary to enable Vaprezsan to serve as a pastor and the MCL 767.5a(2) privilege applies.

### VI. DEFENDANT DID NOT WAIVE THE CLERIC-CONGREGANT PRIVILEGE

The prosecution contends that any privilege attached to defendant and Vaprezsan's communication must be deemed waived by K.'s presence. It is well settled that privileges belong to the holder alone and may be waived only by the holder. See *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 34; 594 NW2d 455 (1999), and *People v Williams*, 39 Mich App 91, 92-93; 197 NW2d 336 (1972) (doctor-patient privilege); *Paschke v Retool Indus*, 445 Mich 502, 518 n 15; 519 NW2d 441 (1994); and *People v Nash*, 418 Mich 196, 219; 341 NW2d 439 (1983) (attorney-client privilege). The same is true of the cleric-congregant privilege: "The privilege of the confessional is the privilege of the penitent . . . ." *People v Lipsczinska*, 212 Mich 484, 493; 180 NW 617 (1920).

In criminal matters, "[w]aiver is the intentional relinquishment or abandonment of a known right or privilege." *People v Williams*, 475 Mich 245, 260; 716 NW2d 208 (2006). Yet a privilege may be deemed waived if the defendant fails to assert it. *People v Watkins*, 468 Mich 233, 235; 661 NW2d 553 (2003) (regarding a

defendant's privilege against forced self-incrimination). And with any privilege, the holder may waive it "through conduct that would make it unfair for the holder to insist on the privilege thereafter." *Howe*, 440 Mich at 214; see also *People v Toma*, 462 Mich 281, 319-320; 613 NW2d 694 (2000) (noting that a criminal defendant who raises an insanity defense cannot fairly raise the psychologist-patient privilege and that a defendant who has placed his or her mental health at issue in this manner must be deemed to have waived the privilege).

A defendant may expressly or impliedly waive both the attorney-client and doctor-patient privileges. A criminal defendant waives the attorney-client privilege by claiming ineffective assistance of counsel. *People v Houston*, 448 Mich 312, 332; 532 NW2d 508 (1995), quoting 8 Wigmore, Evidence (McNaughton rev), § 2327, pp 636-638. A civil litigant may waive the privilege by bringing a claim that directly places the privileged information at issue. *Howe*, 440 Mich at 218-223. A client also waives the privilege by referring to an otherwise privileged conversation on the record *Guilty Plea Cases*, 395 Mich 96, 127; 235 NW2d 132 (1975), or disclosing the conversation to third parties, *Oakland Co Prosecutor v Dep't of Corrections*, 222 Mich App 654, 658; 564 NW2d 922 (1997). Pursuant to MCL 600.2157, a patient waives the doctor-patient privilege by seeking recovery for personal injury or malpractice and producing the physician as a witness.

Similarly, a congregant may waive the cleric-congregant privilege by "giving evidence of what took place at the confessional," *Lipsczinska*, 212 Mich at 493, or sharing the content of the otherwise privileged communication with a third party, see *id.* at 494 (noting that the defendant told an undercover detective posing

as a fellow inmate that she had confessed the details of her crime to a Catholic priest). See also *Dube*, 820 F2d at 890 (concluding that the defendant could claim no privilege over his discussions with a fellow minister regarding his religious-based attempts to avoid income tax responsibility because the defendant had had the same discussions with his secular employer, the Internal Revenue Service, and two congressmen).

Defendant did nothing to expressly waive the cleric-congregant privilege in this case, nor did he take any action from which the court could deem the privilege waived. Defendant timely asserted the privilege in the district court. He did not place the content of his communication with Vaprezsan at issue before the court, nor did he introduce it into the record. And defendant never shared the content of his communication with anyone else. It is irrelevant that defendant's mother told a relative and friend about the communications and that Vaprezsan told the victim's family and the police. The privilege was personal to defendant, and neither K.'s nor Vaprezsan's actions implicate a waiver by defendant.

The prosecution contends that K.'s presence during Vaprezsan's conversation with defendant destroyed any claim to confidentiality or privilege, essentially serving as a waiver of the privilege. Other jurisdictions have held that for the cleric-congregant privilege to apply, the communication must have been made in private. The presence of a third party negates the privilege unless that person is essential for the communication to occur. *Grand Jury Investigation*, 918 F2d at 376, 386; *Martin*, 137 Wash 2d at 787; *Scott*, 870 P2d at 955.

However, the presence of a close relation does not necessarily vitiate the cleric-congregant privilege. In *Archibeque*, 223 Ariz at 233, the defendant's wife was

present when he confessed his acts of child sexual abuse to his LDS bishop. The court held that the

> presence of a third person will usually defeat the privilege on the ground that confidentiality could not be intended with respect to communications that the speaker knowingly allowed to be overheard by others foreign to the confidential relationship. However, this rule does not apply when the presence of a third party does not indicate a lack of intent to keep the communication confidential. . . . [T]he relevant inquiry [is] whether the communicant reasonably understood the communication to be confidential notwithstanding the presence of third parties. [*Id.* at 236 (quotation marks and citations omitted).]

The Arizona Court of Appeals concluded that the communication was confidential despite the presence of the defendant's wife. The pair met with the bishop in the seclusion of the bishop's office. The bishop described his role as assisting the repentance process and providing spiritual guidance for the family as a whole, as well as spiritual counseling for the marriage. The court determined that the communication was confidential based on "the nature of the meeting and the relationships between the parties . . . ." *Id.*

Michigan courts have similarly rejected blanket policies under which the presence of a third party automatically waives a privilege. In *Bassil*, 278 Mich at 178, the Court refused to deem the doctor-patient privilege waived by the presence of the patient's wife, holding that "[t]he presence of one sustaining an intimate family relation with the patient when consulting a physician should not and does not waive the privilege." In relation to the attorney-client privilege, this Court has upheld the confidential nature of a communication when the minor client's agents (her parents) were present during all meetings. *Grubbs v K mart Corp*, 161 Mich App 584, 589; 411 NW2d 477 (1987).

K.'s presence did not destroy the confidentiality of the conversation between defendant and Vaprezsan. Defendant was a minor when Vaprezsan summoned him and K. to the church office. If the claimed privilege had related to the doctor-patient or attorney-client relationship, the presence of a minor patient or client's parent would have certainly been deemed necessary and would not have vitiated the privilege. So too with the cleric-congregant privilege. As defendant's parent, K. could sustain defendant during this difficult conversation. Moreover, there is no record indication that defendant, or even Vaprezsan, believed that K.'s presence destroyed the confidentiality of their communication. K., defendant, and Vaprezsan met in a closed-door meeting late at night. Those conditions support an understanding of confidentiality.

As the evidentiary privilege of MCL 767.5a(2) applies under the circumstances and defendant did not waive that privilege, the circuit court properly precluded the use of Vaprezsan's testimony at defendant's upcoming trial.

Affirmed.

METER and DONOFRIO, JJ., concurred with GLEICHER, P.J.