*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

UNPUBLISHED
June 11, 2020

v

No. 346984
Kalamazoo Circuit Court
LC No. 2017-001231-FC

MICHAEL FRANK FOY,

        Defendant-Appellant.

Before: K. F. KELLY, P.J., and FORT HOOD and SWARTZLE, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of three counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b).[1] For the reasons stated below, we affirm.

## I. FACTUAL BACKGROUND

This case arises out of the sexual assault of a minor child who was less than 12 years of age. Defendant was the victim's stepfather. During trial, defendant's wife testified that she discovered text messages between defendant and the victim. Confused by the messages themselves and the time of night the messages were sent, defendant's wife questioned defendant. After communicating with the victim, defendant's wife discovered that the victim and defendant were having sex. According to defendant's wife, defendant admitted to her that he had sex with the victim and that defendant and the victim were praying in order to try and stop their behavior.

Defendant's pastor also testified that defendant admitted to him on two separate occasions that defendant engaged in sexual intercourse with the victim. The first confession happened in the driveway of defendant's mother's house, while the second confession occurred at the office of defendant's attorney. The pastor testified that both confessions contained the same underlying

---

[1] This Court previously denied defendant's interlocutory appeal of the trial court's order denying defendant's motion to suppress introduction of privileged evidence at trial. *People v Foy*, unpublished order of the Court of Appeals, entered August 31, 2018 (Docket No. 344257).

facts: defendant admitted "that there had been some relationship things going on between [defendant] and [the victim] of a sexual nature" beginning when the victim was eight years old. The pastor further testified that defendant admitted he had engaged in intercourse and oral sex with the victim over a period of two years.

The victim testified that defendant began sexually assaulting her when she was seven years old. She testified that the first sexual assault happened when she was in her mother's bedroom watching television and defendant touched her vagina with his hand "[i]nside and outside" but "[m]ostly the inside" and asked her if it was okay. She also stated that it happened a second time, which was the "same thing as the first time." According to the victim, the first penile penetration happened in her stepbrother's room when she was about seven or eight years old. The victim testified that defendant "went in a little bit and I told him it hurt, so I told him 'ow.' I said, ow and he stopped and he said he'd never hurt me." The victim did not identify this occasion as the first time she and defendant had sex because "it didn't completely go in."

The victim further testified about a sexual assault that happened in the basement when defendant "stuck his penis inside of [her] vagina" while giving her a hickey. The victim stated that she and defendant had sex on the couch in the living room as well. There were also occasions when defendant would have sex with the victim in her bedroom while they were in the victim's bed. The victim stated that "he would have me do . . . like different positions and he's [sic] stand on the ground and I'd be on all fours on my bed." While in the victim's bedroom, defendant would insert his penis inside her vagina and put his hands on her back. The victim also identified numerous other occasions when defendant would "put his dick in [her] mouth and [she] had to suck it and it was gross."[2]

Connie Black-Pond, a licensed social worker and professional counselor, testified with regard to children lying in general about sexual assault. The prosecution asked, "[H]ave you encountered any cases where a child was lying and making things up?" Black-Pond responded, "I have talked to less than five children and probably not even that, but somewhere between 2 to 5 children that may have made up part of it or all of it." She also stated:

> I've—I have myself seen in my treatment setting probably over 2,000 children. So, when I think of lying—. And, I—and, I'll back up to say—my description of the distorted beliefs is common with probably 99-percent of the children that I've seen. Whereas lying, which is maybe—we think of as purposeful and misleading other people. For some reasons that actual lying for reasons other than coping are below five. So, it's a very small percentage.

Black-Pond further indicated that older children are the ones who typically lie because they are the ones "who have a sense of if I say this happened then I won't have to go to my dad's or my mom's."

---

[2] There was also testimony presented from defendant's niece and two ex-sisters-in-law who testified about defendant sexually assaulting them when they were underage. This testimony was not challenged on appeal.

Black-Pond continued by saying that there was a "very small percentage of children that might actually make something up to get their needs met."

The jury found defendant guilty of three counts of CSC-I. The trial court sentenced defendant to three concurrent sentences of 25 to 50 years' imprisonment. This appeal followed.

## II.  THE CLERIC-CONGREGANT PRIVILEGE

Defendant first argues that the trial court erred when it denied defendant's motion to suppress the pastor's testimony on the basis that it was not a confidential communication under the cleric-congregant privilege.[3]  We disagree.

We review a trial court's findings of fact in a suppression hearing for clear error, while the ultimate issue on a motion to suppress is reviewed de novo. *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009). "Clear error exists if the reviewing court is left with a definite and firm conviction that a mistake has been made." *People v Johnson*, 466 Mich 491, 497-498; 647 NW2d 480 (2002). We also review de novo the question whether a privilege may be asserted. *People v Carrier*, 309 Mich App 92, 104; 867 NW2d 463 (2015).

Our holding in *People v Bragg*, 296 Mich App 433; 824 NW2d 170 (2012), provides the relevant analysis. *Bragg* involved a defendant who was bound over to circuit court for CSC-I based in part on testimony from the defendant's pastor. *Id*. at 436. The pastor testified about the defendant's admission to sexually assaulting the defendant's then nine-year-old cousin, to which the district court concluded the cleric-congregant privilege did not apply. *Id*. Once bound over, the circuit court quashed the pastor's testimony as protected under the cleric-congregant privilege. *Id*. We granted the prosecution's interlocutory appeal to challenge the circuit court's decision, providing us the opportunity to analyze MCL 600.2156 and MCL 767.5a(2). *Id*. at 444. The question before the *Bragg* Court was narrow, and it was framed as "whether the pastor may give testimony against his congregant, either voluntarily or by court order, disclosing statements made in confidence." *Id*. at 444-445.

We determined that, when MCL 600.2156 and MCL 767.5a(2) are read together, "the more specific MCL 767.5a(2) creates an evidentiary privilege, precluding the incriminatory use of 'any communication' made by a congregant to his or her cleric when that communication was 'necessary to enable the' cleric 'to serve as such' cleric." *Id*. at 453. In order to identify when a communication is necessary to enable the cleric to serve as such cleric, we laid out a three-factor test. First, "the communication must have been 'necessary to enable' " the cleric " 'to serve as such . . . member of the clergy.' " *Id*. at 454, quoting MCL 767.5a(2). "[A] communication is necessary to enable a cleric to serve as a cleric if the communication serves a religious function such as providing guidance, counseling, forgiveness, or discipline." *Id*. Second, the communication must have been imparted to the cleric in the cleric's "professional character." *Id*. at 456-457.

---

[3] Also known as the " 'priest-penitent privilege' or the 'cleric-communicant privilege.' " *People v Bragg*, 296 Mich App 433, 436 n 1; 824 NW2d 170 (2012).

> For a communication to be made to a cleric in his or her professional capacity, the congregant must speak to the cleric as part of the cleric's "job" as a cleric. The congregant cannot speak to the cleric in his or her role as a relative, friend, or employer and receive the benefit of the evidentiary privilege. [*Id*. at 458-459.]

Third, the communication must be "made as part of the discipline enjoined by the cleric's denomination." *Id*. at 459. We instructed in *Bragg* that, with regard to this third element, we are "bound to accept the guidance provided by the clerical witness without embarking on a fact-finding mission." *Id*.

Defendant's argument essentially invites us to accept the view that only the first and second, or first and third, elements are required to establish whether a communication is necessary to enable the cleric to serve as such cleric. In other words, defendant argues that elements two and three are in the alternative and that a party seeking the privilege under MCL 767.5a(2) need only establish one or the other along with the first element. We decline this invitation.

First, defendant's reliance on *Bragg*'s use of the word "also" casts doubt on his argument that two of the three elements are required and not all three. According to defendant's use of the word "also," *any one* of the elements would suffice to establish that the communication was necessary to allow the cleric to serve as a cleric. *Bragg* identified that "a communication is necessary to enable a cleric to serve as a cleric if the communication serves a religious function such as providing guidance, counseling, forgiveness, or discipline." *Bragg*, 296 Mich App at 455. Then, when identifying the next two elements, the *Bragg* Court stated that "the elements of MCL 600.2156 are *also* useful in determining whether a communication is necessary to enable a cleric to serve as a cleric." *Id*. at 456-457 (emphasis added). Under defendant's reading, both elements two and three would merely be alternative ways to establish the cleric's role aside from the first element.

Second, the professional-capacity element (second element) and discipline-enjoined element (third element) are both found in MCL 600.2156, which we interpreted and stated that "the *elements* of MCL 600.2156 are *also* useful in determining whether a communication is necessary to enable a cleric to serve as a cleric." *Bragg*, 296 Mich App at 456-457 (emphasis added). This statement came after our announcement about the religious-function element (first element). See *id.* at 455. The *Bragg* Court's use of the word "also" and pluralization of the word "elements" indicate that the *Bragg* Court intended the elements of MCL 600.2156, i.e., whether the cleric acted in his professional capacity and whether the communication was made a discipline enjoined by the religion, to be considered when determining whether a communication was necessary to enable the cleric to serve as a cleric. Moreover, the use of the word "also" in this context demonstrates that *Bragg* was adding these two elements in conjunction with the first two elements.

The *Bragg* Court analyzed each element because *all three together* established whether the communication was necessary to enable the pastor to serve as the pastor. See *id*. at 462-463. This is further evidenced by our holding—taking into account all three elements—that "[t]he communication was necessary to enable [the pastor] to serve as a pastor *because defendant communicated with [the pastor] in his professional character in the course of discipline enjoined*

*by the Baptist Church.*" *Id.* at 462 (emphasis added). Therefore, we conclude that all three elements are required to establish invocation of the privilege under MCL 767.5a(2).

With that in mind, defendant has not established that the trial court erred when it concluded that the privilege did not apply. Defendant's pastor testified that when defendant first admitted to the pastor that he was having intercourse with his step-daughter, the two did, indeed, pray together about the situation. At the same time, the pastor testified that he was a friend of defendant's and that defendant also asked him in that conversation to place a telephone call to his ex-wife and accompany defendant to a meeting with his attorney the following morning. The following day, defendant again admitted to having sexual intercourse with his step-daughter, and during that time, the pastor provided no advice or input other than praying for the family outside afterwards. The trial court determined that defendant had not necessarily communicated with the pastor as a pastor, but instead as a friend from whom defendant sought "help . . . with his mounting serious legal predicament." We discern no clear error from that conclusion. And, even more importantly, we note that defendant does not even dispute that the third element from *Bragg* has not been met. Defendant's pastor explicitly testified at the hearing on defendant's motion to preclude the pastor's testimony that he had concluded with his church elders that communications are not considered confidential in their denomination when they involve "harm to anyone else or their immediate family," or when the communication demonstrates that the congregant is a "threat to themselves or anyone else." The trial court did not err when it determined that the cleric-congregate privilege under MCL 767.5a(2) was inapplicable.

III. EXPERT TESTIMONY

Defendant next argues that the trial court erred when it admitted testimony from an expert witness who vouched for the victim's credibility. We agree that the testimony should not have been permitted, but disagree that the error affected defendant's substantial rights.

Generally, we review preserved claims of evidentiary error for an abuse of discretion. See *People v Bergman*, 312 Mich App 471, 482; 879 NW2d 278 (2015). However, unpreserved claims of evidentiary error are reviewed for plain error affecting defendant's substantial rights. See *People v Coy*, 258 Mich App 1, 12; 699 NW2d 831 (2003). Under this standard,

> [f]irst, there must be an error; second, the error must be plain (i.e., clear or obvious); and third, the error must affect substantial rights (i.e., there must be a showing that the error was outcome determinative). Moreover, reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of guilt or innocence. [*Id.* (citations omitted).]

Pursuant to MRE 702, expert testimony will be allowed as follows:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product

of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

However, our Supreme Court has held before that expert testimony regarding estimations of the percentage of children who lie about sexual abuse can constitute improper vouching for the veracity of a child victim. *People v Peterson*, 450 Mich 349, 375-376; 537 NW2d 857 (1995). Moreover, *Peterson* was reaffirmed by our Supreme Court's holding in *People v Thorpe*, 504 Mich 230; 934 NW2d 693 (2019), in which our Supreme Court held that expert opinion testimony about "only 2% to 4% of children lie about sexual abuse" was "for all intents and purposes vouch[ing] for [the complainant]'s credibility." *Id.* at 259.

In this case, similar to *Thorpe*, the expert witness essentially testified about the victim's credibility. The prosecution asked, "[H]ave you encountered any cases where a child was lying and making things up?" The expert witness responded, "[W]orking with children, which dates back to 1990, I have talked to less than five children and probably not even that, but somewhere between 2 to 5 children that may have made up part of it or all of it." The expert witness also identified that she had worked with roughly 2,000 children and that less than five, "a very small percentage," had lied. This clearly violates the holding outlined in *Thorpe*. Although the expert witness did not give an exact percentage of children she had encountered that lied like the witness in *Thorpe*, she did state that it was a small percentage, and her statement nonetheless qualified as indirectly vouching for the victim's credibility. As stated in *Thorpe*, "one might reasonably conclude on the basis of [the expert witness]'s testimony that there was a 0% chance [the victim] had lied about sexual abuse." *Id*.

That having been said, this is where the similarities end. In *Thorpe*, the Supreme Court concluded that

> Thorpe's trial was a true credibility contest. There was no physical evidence, there were no witnesses to the alleged assaults, and there were no inculpatory statements. The prosecution's case consisted of BG's allegations, testimony by her mother regarding BG's disclosure of the alleged abuse and behavior throughout the summer and fall of 2012, and Cottrell's expert testimony. Thorpe testified in his own defense and denied the allegations. Additionally, Kimberly testified about other reasons for BG's behavior during the summer and fall of 2012; namely, that her mother had started a new relationship and become pregnant and that Thorpe had decided to no longer have parenting time with BG. Because the trial turned on the jury's assessment of BG's credibility, the improperly admitted testimony wherein Cottrell vouched for BG's credibility likely affected the jury's ultimate decision. [*Id*. at 260.]

This case was not a *true* credibility contest.

Although there was no physical evidence of sexual abuse or witnesses to the alleged assaults, see *id*., there were inculpatory statements. Defendant's wife and pastor both testified about multiple separate instances in which defendant admitted to them about the sexual assaults. There were also text messages admitted into evidence that were incredibly probative of a sexual relationship between defendant and the victim. One text from the victim to defendant stated, "tell

mom about us." One late-night text from defendant to the victim stated, ". . . thinking of why the hell I'm laying here alone;" another stated, "Text me, sexy." The victim purportedly responded, "You want me hotshot," and later texted, "Dude, I don't want to be stuck here flirting on a phone." This is not an exhaustive representation of the incriminatory text messages admitted at trial. Lastly, there was also evidence that defendant sexually assaulted three other individuals who were underage at the time of the assaults.

"It is the function of the jury alone to listen to testimony, weigh the evidence and decide the questions of fact." *People v Palmer*, 392 Mich 370, 375; 220 NW2d 393 (1974). "In determining the facts the jury may draw reasonable inferences from the facts established by either direct or circumstantial evidence." *Id*. at 395. "[C]ircumstantial evidence and all reasonable inferences drawn therefrom can constitute satisfactory proof of the crime." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Therefore, we cannot conclude that the admission of the expert witness's testimony in this case deprived defendant of his substantial rights. See *Coy*, 258 Mich App at 12.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that defense counsel was ineffective for failing to object to the admission of the expert witness's testimony. We disagree.

Determining whether a defendant received ineffective assistance of counsel is a mixed question of fact and constitutional law. *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018). This Court reviews findings of facts for clear error and questions of law de novo. *Id*. When the trial court does not hold an evidentiary hearing or the defendant did not move for a new trial, there are no factual findings to which the reviewing court must defer, and the reviewing court's review is limited to mistakes apparent from the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

In order to receive a new trial on the basis of ineffective assistance of counsel, defendant "must show both that counsel's representation fell below an objective standard of reasonableness, and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v Spisak*, 558 US 139, 149; 130 S Ct 676; 175 L Ed 2d 595 (2010) (quotation marks and citation omitted); *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). Accordingly, a defendant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Trakhtenberg*, 493 Mich at 62. Secondly, defendant must show a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. "Because defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). Generally, decisions regarding whether to raise objections are presumed to be matters of trial strategy, and declining to object to evidence often is consistent with sound trial strategy. See *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008).

For purposes of this appeal, we can assume that defense counsel's failure to object to the expert witness's testimony was objectively unreasonable. However, as with defendant's ability to show that expert witness error affected his substantial rights, defendant cannot establish prejudice for the purposes of ineffective assistance of counsel. A defendant claiming ineffective assistance of counsel must establish that there is a reasonable probability that, but for defense counsel's alleged error, the outcome of the proceedings would have been different. See *People v Jackson*, 313 Mich App 409, 431; 884 NW2d 297 (2015).

Aside from the expert witness's improper vouching for the victim's credibility, there were still two other witnesses who testified about defendant admitting to them about having a sexual relationship with the victim. As noted above, there were incredibly incriminatory text messages, and furthermore, there was testimony from other alleged victims who testified about sexual assaults defendant committed when they were underage. On the basis of all this evidence, the jury could reasonably infer that defendant committed three counts of CSC-I, see *Nowack*, 462 Mich at 400, and absent the testimony from the expert witness that vouched for the victim's credibility, there is not a reasonable probability that the outcome of the proceeding would have been different, see *Jackson*, 313 Mich App at 431.

## V. CUMULATIVE EFFECTS OF ERRORS

Lastly, defendant argues that the cumulative effect of the alleged errors warrants a new trial. We review the issue of cumulative effects "to determine if the combination of alleged errors denied defendant a fair trial." *People v Knapp*, 244 Mich App 361, 387; 624 NW2d 227 (2001). Unpreserved claims of error are reviewed for plain error affecting substantial rights. See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Plain error affects substantial rights when it alters the outcome of the trial court proceedings. See *id.* Reversal is appropriate when an error is so serious it results in the conviction of an innocent defendant or when it "affects the fairness, integrity, or public reputation of judicial proceedings, independent of the defendant's innocence." *Id.* (quotation marks, citation, and alteration omitted).

> The cumulative effect of several minor errors may warrant reversal even when individual errors in the case would not warrant reversal. In order to reverse on the grounds of cumulative error, the errors at issue must be of consequence. In other words, the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial. [*Knapp*, 244 Mich App at 388.]

In this case, as we concluded earlier, there were no errors aside from the improper testimony from the expert witness that essentially vouched for the victim's credibility. This error alone would not require reversal because the admission of such testimony did not deprive defendant of his substantial rights. See *Carines*, 460 Mich at 763-764. Because no errors have been established, reversal is not warranted on the basis of cumulative error. See *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007) ("Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal."). Likewise, when there are not several individual errors, there can be no aggregation to form a cumulative effect that requires reversal. See *Unger*, 278 Mich App at 258.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle